# Exhibit A

HINKLE LAW FIRM, LLC
1617 N. Waterfront Pkwy, Suite 400
Wichita, Kansas 67206-6639
(316) 267-2000 / (316) 264-1518, facsimile

## IN THE THIRTIETH JUDICIAL DISTRICT
## DISTRICT COURT, SUMNER COUNTY, KANSAS
## CIVIL DEPARTMENT

WYLDEWOOD CELLARS, INC., and
JOHN BREWER,

*Plaintiffs*,

v.

TORRO, LLC dba TORRO FUNDING,

*Defendant*.

Case No. 22 CV
Pursuant to KAN. STAT. ANN. Chapter 60

### PETITION

Plaintiffs Wyldewood Cellars, Inc. and John Brewer (together "Plaintiffs"), by and through

their attorney Nicholas R. Grillot of the Hinkle Law Firm, LLC, state and allege for their cause of

action against Defendant Torro LLC dba Torro Funding the following:

### The Parties

1.    Plaintiff Wyldewood Cellars, Inc. ("Wyldewood") was, for all relevant times to this

Petition, a Kansas corporation with its principal place of business located in Sumner County,

Kansas.

2.    Plaintiff John Brewer ("Brewer") was a resident of Sumner County, Kansas for all

relevant times for this Petition.

3.    Defendant Torro, LLC dba Torro Funding ("Torro") is a Utah limited-liability

company with its principal place of business at 5965 S. 900 E, Suite 300, Murray, Utah 84121.

Torro can be served process through its resident agent, Cameron Neal Montgomery, or an officer, director, or other general agent at Torro's principal place of business.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over the claims in this case because Plaintiffs' causes of action arose in Sumner County, Kansas.

5.      Venue is proper in Sumner County under KAN. STAT. ANN. § 60-604(2) for the same reason – Plaintiffs' causes of action arose in Sumner County, Kansas.  Venue is also proper in Sumner County under KAN. STAT. ANN. § 60-604(3) because Torro is transacting business in Sumner County, Kansas and under KAN. STAT. ANN. § 60-605(1) because Torro is not registered to do business in Kansas and Plaintiffs' both reside in Sumner County.

6.      Finally, this Court has personal jurisdiction because Torro purposefully availed itself of the laws in the State of Kansas by knowingly transacting business with Wyldewood and Brewer and by registering the judgment it obtained in Utah in Kansas.

## Introduction and Background

7.      Torro is a business lender who preys upon its victims by offering them funding in the form of so-called a "merchant cash advance" or "MCA".  MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a percentage of a business's future receivables.

8.      Relying almost solely on the deposits and balances disclosed in bank statements provided by Wyldewood, Toro determined what Wyldewood's "future receivables" would be and determined its purported purchase price based on the percentage of those "future receivables" it was purchasing.

9.     But this merchant cash advance was, in fact unlawful, charging excessive interest to the point Wyldewood failed to gain any recognizable benefit from the funds initially loaned to it. Also, under the agreement between Torro and Wyldewood, Torro deducted daily amounts directly from Wyldewood's bank account(s) regardless of the amount of receipts that Wyldewood earned that day.

10.    To evade applicable lender statutes, Torro disguises these agreements as a purchase and sale of future receivables agreement, but its terms, conditions, and Torro's actions demonstrate that, despite the agreement's form, no sale of receivables took place. Rather, Torro's MCA agreement was intended to be a loan from inception and Torro's conduct and the documents plainly demonstrate that Torro is not actually purchasing receivables or future receipts but using this false construct to hide an unlawful loan transaction.

11.    While it is bad enough when a merchant/business has one merchant cash advances, the harm is typically multiplied and compounded because a business is forced to take a second MCA in order to keep up the payments on the first MCA, then a third MCA to keep up the payments on the first and second MCAs just to keep the business afloat by replacing the money being automatically deducted each day from the company's bank account by other lenders regardless of such company's daily receipts.

12.    This typical unending cycle is evident in this Case as Wyldewood was forced to take second, third, fourth, and even an eighth MCA from seven different MCA lenders in an attempt to stay afloat and replace the money automatically being debited from the Wyldewood's bank account on a daily basis. [1]

---

[1] In addition to the merchant cash advance loan by Torro at issue in this case, Wyldewood also took out merchant cash advance loans with Liberty Funding Solutions, LLC, Mayfair Business Capital, LLC, RBR Global, LLC, Diverse Capital, LLC, and Mantis Funding, LLC (collectively referred to as the MCA Lenders or other MCA Lenders).

13.     This case is indicative of the abuses in this industry and how such abuses resulted in a downward spiral of unending debt for Wyldewood. Rather than shut down the business or be forced into bankruptcy (for both their businesses and individual bankruptcies as a result of personal guarantees of each of these unlawful loans), Plaintiffs turn to this Court for much-needed relief.

14.     It is against this backdrop that Plaintiffs bring claims against Torro sounding in RICO, tortious interference with Wyldewood's business contracts, the Kansas Consumer Protection Act, and breach of contract.

15.     All conditions precedent to the bringing of this action have occurred, been performed, or have been otherwise waived.

## Summary of Case

16.     Wyldewood is a family-owned vineyard and winery located in Peck, Kansas, about 20 miles south of Wichita, Kansas. Wyldewood has been in business for over 25 years.

17.     Like many other small businesses, Wyldewood, suffered financially in recent years, especially during the COVID-19 pandemic.

18.     While Wyldewood had previously relied primarily on traditional lenders, Wyldewood recently fell victim to a group of funders who prey upon their victims by offering funding in the form of so-called "merchant cash advances" or "MCAs".

19.     Torro loans money to merchants, like Wyldewood, under the guise of a merchant cash advance, which it describes as a 'purchase and sale of future receivables.' As a general matter, an issuer of a merchant cash advance provides a merchant with a lump-sum payment in exchange for a share of the merchant's future sales income/receipts, or "receivables," up to a certain total repayment amount.

20.    As a result, unlike a loan, a true merchant cash advance does not guarantee an issuer with a regular payment or a fixed, finite term. Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables. Because payment amounts vary, the lengths of repayment terms also vary.

21.    This variability and lack of security create certain risks for issuers but also supposedly create certain protections for merchants by being able to reduce required payments when business is slow.

22.    In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term. In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), both federal and state law imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

23.    Torro attempts to style its transactions as merchant cash advances – 'purchases of future receivables' – in order to evade legal protections and requirements that exist for loans. But in fact, Torro's transaction with Wyldewood functioned as a loan, and, as a result, Wyldewood is entitled to the protections afforded to borrowers under state and federal law.

24.    Wyldewood entered into a Secured Merchant Agreement for the Purchase and Sale of Future Receivables with Torro on March 24, 2021 ("MCA Agreement"). A copy of the MCA Agreement is attached as Exhibit 1 to the Petition.

25.    The MCA Agreement contains the following:

    a.    The amount of future receivables that Torro was allegedly purchasing of $111,750.00 ("Purchased Amount") (*see* p. 1 and p. 2, Section 1(e) of Ex. 1);

   b. The percentage of future receivables allegedly being purchased of 12% (p. 1 and p. 2, Section 1(b) of Ex. 1);

   c. The amount of $75,000.00 that Torro was to pay to Wyldewood for the future receivables (p. 1 and p. 2, Section 1(f) of the Ex. 1);[2] and

   d. The daily amount of $931.25 was to be removed via ACH from the bank account of Wyldewood ("Initial Daily Installment"), which is approximately $20,487.50 per month depending on the number of weekdays in a month). (*see* p. 1 and p. 2, Section 1(g) of Ex. 1.

  26. If annualized, the rate of interest on the money provided by Torro is approximately 149% per annum.

  27. Torro had Wyldewood grant it a security interest in all of its assets (not just the receivables) including, but not limited to, such items as all of Wyldewood's assets and fixtures, equipment, and inventory, etc. *See* p. 8, Section 22 of Ex. 1.

  28. Torro also required a personal guaranty from Brewer, who is the President of Wyldewood. *See* p. 13, Exhibit A to Ex. 1.

  29. Based on these terms, the MCA Agreement has all the indicia of a loan.

#### The MCA Agreement requires fixed payments based on the repayment term

  30. Initially, the MCA Agreement requires regular fixed payments determined by the length of the repayment period.

  31. Under the MCA Agreement, Torro required Wyldewood to repay the loan through set, daily payments of $931.25, which were debited from Wyldewood's bank account. With this

---

[2] Although the Purchase Price was $75,000, Torro did not actually fund that amount. Torro took multiple deductions such as underwriting fees, origination fees, ACH set-up fees, etc. and only wired Wyldewood $70,000.00.

amount as the daily payment, Wyldewood would repay the Purchased Amount in a short term of 120 days.

32.     Unlike a true purchase of future receivables, Torro did not set the daily payment amount as an actual, reality-based, percentage of Wyldewood's daily receipts, but it set the Initial Daily Installment solely upon the term/length of the loan within which such Defendant wants to be repaid.

33.     In other words, while Torro had access, prior to preparing their form contract and prior to the funding, to all of the necessary financial records including the bank statement of Wyldewood, Torro did not actually tailor the Initial Daily Installment to Wyldewood's actual business receipts. Rather, Torro pretended to do so in order to circumvent laws designed to protect companies like Wyldewood.

### The Percentage of Receivables Allegedly Being Purchased Had No Basis In Reality

34.     To further evidence that the 'specified percentage of receivables purchased' was just an artifice in furtherance of pretending that Torro and other MCA Lenders were purchasing a fixed and specific set of receivables, during the four-month period from December 10, 2020 to April 8, 2021, Torro and the other MCA Lenders collectively purchased a whopping 147% of the daily receipts of Wyldewood.[3] This demonstrates how the entire 'purchase of future receivables' concept was a sham created to avoid lending/interest limitations since it is impossible for one company sell 147% of its daily receivables.

35.     More importantly, Torro knew that daily payments were being made for other merchant capital agreements. As part of its pre-funding due diligence process, Torro obtained at least the previous three months of a Wyldewood's bank statements. Those statements show that

---

[3] The MCA lenders being sued in New York supposedly purchased 135% of Wyldewood's daily receipts.

Wyldewood was already paying other MCA Lenders on a daily basis. Additionally, Wyldewood's

books and records at the time, reflected Wyldewood's obligations to the other MCA Lenders,

including the percentages of future receivables each purchased. These financial records were

either produced to Torro, or at the very least, available to Torro to review as part of its due

diligence. This alone should demonstrate how the entire 'purchase of future receivables' concept

was a farce since it is impossible for one company sell over 100% of its daily receivables.

### The Defendants Intentionally Disguised the True Nature of the Transactions.

36.     Despite the terms of the MCA Agreement, in economic reality, the MCA

Agreement is a loan that is absolutely repayable. Among other hallmarks of a loan:

(a)     The daily payments required by the MCA Agreements were fixed and the

so-called reconciliation provision was mere subterfuge to avoid the application of federal and state

law. Rather, just like any other loan, the Purchased Amount was to be repaid within a specified

time;

(b)     The default and remedy provisions purported to hold the Plaintiffs

absolutely liable for repayment of the Purchased Amount. The MCA Agreement obligated

Wyldewood to ensure sufficient funds were maintained in a designated account to make the daily

payments and, after a certain number of instances of insufficient funds being maintained in the

account, the Plaintiffs were in default and, upon default, the outstanding balance of the purchased

amount became immediately due and owing;

(c)     While the MCA Agreement purported to "assign" all of the Wyldewood's'

future account receivables to Torro until the purchased amount was paid, Wyldewood retained all

the indicia and benefits of ownership of the account receivables including the right to collect,

possess, and use the proceeds thereof. Indeed, rather than purchasing receivables, Torro merely

acquired a security interest in the Wyldewood's accounts to secure payment of the purchased amount;

  (d) Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of Wyldewood's credit worthiness; not the creditworthiness of any account debtor;

  (e) The Purchased Amount was not calculated based upon the fair market value of each of Wyldewood's future receivables, but rather was unilaterally dictated by Torro based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, Torro never requested any information concerning Wyldewood's account debtors upon which to make a fair market determination of their value;

  (f) The amount of the daily payments was determined based upon when Torro wanted to be paid, and not based upon any good-faith estimate of Wyldewood's future account receivables;

  (g) Torro did not assume a risk of loss due to Wyldewood's failure to generate sufficient receivables because the failure to maintain sufficient funds in Wyldewood's bank account constituted a default under the MCA Agreement;

  (h) Torro required that Wyldewood undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations, and warranties constituted a default, which fully protected Torro from any risk of loss resulting from Wyldewood's failure to generate and collect receivables; and

  (i) Torro required that Wyldewood grant it a security interest in its receivables, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, and

inventory and, further that Brewer personally guaranteed the performance of the representations, warranties, and covenants, which Torro knew would be breached from day one.

37.    Torro also showed in its underwriting practices that the MCA Agreement was a loan. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing. When underwriting new transactions including those entered into with Wyldewood herein, Torro failed to evaluate Wyldewood's receivables, which are the assets they are purportedly buying, but instead focus on other factors such as Wyldewood's credit ratings and bank deposits over a 3-month period.

38.    When Torro began to collect on the MCA Agreement, it treated the MCA Agreement just like a loan. For example, Torro required that make fixed daily payments and grant security interests to Torro in all or substantially all of Wyldewood's assets to ensure that the daily payments are made.

39.    After Torro declared a default on the MCA Agreement, Torro sent notices to Wyldewood's account debtors just like a typical secured creditor who maintained a security interests in accounts receivables would. *See* Torro's UCC Notice to Wyldewood's account debtors attached as Exhibit 2. In short, Torro structured the MCA Agreement to function just like the loan it are intended to be and not the receivable purchases the MCA Agreement purported to be.

### The MCA Agreement Was Not a Sale of Future Receipts.

40.    Notwithstanding its title, the MCA Agreement was not the sale/purchase of receivables. The MCA Agreement has none of indicia of a true sale. Among other things: (i) the future receipts allegedly purchased by Torro had already been sold to the other MCA Lenders under a previously executed agreement (which would be obvious from the daily debits shown on

the bank statements that Wyldewood provided Torro); (ii) the MCA Agreement failed to transfer the risk and benefits of ownership of the future receipts from Wyldewood to Torro; (iii) Wyldewood remained absolutely liable for repayment of Purchase Amounts; (iv) Torro had full recourse rights against Wyldewood and Mr. Brewer; and (v) the MCA Agreement's reconciliation provisions are a sham.

i.    *Wyldewood had already sold 100% of its receivables*

41.    By the time the MCA Agreement was executed between Wyldewood and Torro, there were no future receipts left to purchase since Wyldewood had already purportedly sold over 100% of its daily revenue. *See* ¶ 34, *supra*.

ii.    *The Terms of the MCA Agreement Failed to Transfer the Risks and Benefits of Ownership of Future Receipts from Wyldewood to Torro.*

42.    The *sine qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfer from the seller to the buyer. That did not occur in connection with the MCA Agreement.

43.    Here, Wyldewood was responsible for generating and collecting the future receipts, it exercised complete dominion and control over the future receipts, and it retained the risk of non-collectability with respect to the future receipts. In other words, notwithstanding the sale and assignment language of the MCA Agreement, all of the benefits and risks of ownership of the future receipts remained with Wyldewood.

44.    Pursuant to the MCA Agreement, the pretend seller (Wyldewood) was responsible for collecting the proceeds of its transactions and depositing a "Specified Percentage" of each transaction into a designated account so that Torro could debit its daily payments.

45.    So long as it made the daily payments, Wyldewood was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased future receipt, in its daily operations.

46.    Indeed, the excess proceeds were supposedly Wyldewood's only source of operating capital because the MCA Agreements specifically prohibited Wyldewood from further encumbering the future receipts. Thus, Wyldewood had to use the proceeds of the allegedly purchased future receipts in order to operate its business.

47.    Wyldewood's complete dominion and control over the future receipts and its right to use the proceeds of the alleged purchased future receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the MCA Agreements were a true sale.

48.    Similarly, Wyldewood retained the risk of loss associated with non-payment of the future receipts. Among other things, if a particular future receipt was not collectible, there was no reduction in the purchased amount and Torro would be repaid from the next collected future receipt or the proceeds of any other sale transaction.

iii.    *Wyldewood Remained Absolutely Liable for Repayment of the Purchased Amount*

49.    By operation of the default rights and remedies under the MCA Agreement, repayment of the Purchased Amount was put beyond any risk of non-payment of the "purchased" receivables and Wyldewood remained absolutely liable for repayment of the purported Purchase Amount.

50.    Under the MCA Agreements, if an event of default occurred, Wyldewood (the pretend seller of the future receipts) immediately became liable for the full outstanding Purchased

Amount, together with additional fees and costs due under the MCA Agreement, irrespective of the collection on the "purchased" receivables.

51.     Torro could also declare a default without providing any notice to Wyldewood whatsoever. *See* p. 9, Section 28 of Ex. 1.

52.     An event of default is defined under the MCA Agreement in such a way that a default would occur under any and every conceivable circumstance wherein Wyldewood failed to generate or collect future receipts to repay Torro. *See* p. 9, Section 27 of Ex. 1.

53.     Most importantly, the failure Wyldewood (the pretend seller of the future receipts) to generate and collect sufficient revenue to make the daily payments would automatically constitute an Event of Default under the MCA Agreement after just a few days of having insufficient funds ("NSF") in the account which is set up for automatically daily ACH debits irrespective of the performance of the "purchased" receivables.

54.     It would also be an Event of Default under the MCA Agreement if Wyldewood/the pretend seller of the future receipts: (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if Wyldewood's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, Plaintiffs would be in default of the MCA Agreement and, pursuant to the remedies provided by such Agreement, Plaintiffs would be liable for the full amount of the pretend purchase price of the future receipts, plus all fees and costs due under the MCA Agreement. *Compare* p. 7, Section 21(f) with p. 9, Section 27 of Ex. 1.

               iv.     *Torro Retained Full Recourse Rights*

55.     In order to further ensure its performance under the MCA Agreement, Wyldewood granted Torro a security interest in substantially all of its assets including all of its all accounts,

chattel paper, documents, equipment, general intangibles, instruments, and inventory (the "Collateral").

56.     Upon an Event of Default, Torro was entitled to exercise all of its rights and remedies under the UCC.

57.     Thus, if Wyldewood/the pretend seller of the future receipts missed as few daily payments, for any reason whatsoever, Torro could foreclose on the Collateral.

58.     Such recourse provisions are not indicative of a true sale, but rather, a loan.

> v.     *The MCA Agreements Each Uses a Sham Reconciliation Provision to Disguise the Loans.*

59.     In order to evade restrictions on lenders, Torro included a sham reconciliation provision in the MCA Agreement to give the appearance that there was not a definite repayment term.

60.     Under a legitimate reconciliation provision, if Wyldewood pays more through its fixed daily payments than it actually received in receivables, Wyldewood is entitled to seek the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

61.     For example, if Torro had purchased 25% of Wyldewood's receivables, and Wyldewood generated $100,000 in receivables for the month, the most that Torro is entitled to keep is $25,000. Thus, if Wyldewood paid $40,000 through its daily payments, then Wyldewood is entitled to $15,000 back under the sham reconciliation provision.

62.     In order to ensure that Wyldewood can never uses its sham reconciliation provision, however, Torro falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, Torro ensured that if sales decrease, the required fixed daily payments remain the same.

63.     For example, if 25% of Wyldewood's actual monthly receivables would result in a daily payment of $1,000, Torro and the MCA Agreement falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, Wyldewood would not be able to invoke the reconciliation provision.

64.     The MCA Agreement also requires the actual receipts to reduce by 15% in order for any adjustment to be made to the ongoing Initial Daily Installment, rather than the percentage to actual reflect the decreased amount. *See* p. 4, Section 12(b) of Ex. 1.

65.     On information and belief, Torro does not actually have a reconciliation department and has never refunded a merchant money as required under its sham reconciliation provision.

66.     To make matters worse, Wyldewood actually requested a reconciliation be performed so that the daily payment more accurately reflected the amount of the receipts purchased but Torro refused to perform the required reconciliation.

### The Agreement Is Substantively and Procedurally Unconscionable

67.     Torro's Agreement with Wyldewood is an unconscionable contract of adhesion that are not negotiated at arms-length.

68.     Instead, the Agreement contains one-sided terms that preyed on Plaintiffs' desperation and help conceal the fact that Torro's transaction involving Wyldewood was really a loan.

69.     Among the one-sided terms, the Agreements include: (1) a provision giving the Torro the irrevocable right to withdraw money directly from Wyldewood's bank accounts, including collecting checks and signing invoices in Wyldewood's name, (2) a provision preventing Wyldewood from transferring, moving or selling the business or any assets without permission from Torro, (3) a requirement that Wyldewood provide Torro with access codes to Wyldewood's

accounts (4) a one-sided attorneys' fees provision obligating Wyldewood to pay Torro's attorney fees but not the other way around, (5) venue and choice-of-law provisions requiring Wyldewood to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of Wyldewood's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of Wyldewood's premises in favor of the MCA company, (13) the right to enter Wyldewood's business without notice, (14) the right to direct all credit card processing payments to Torro, (15) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Torro," and (15) a power of attorney authorizing Torro "to take any action or execute any instrument or document to settle all obligations due…."

70. The MCA Agreement is also unconscionable because it was designed to fail. Among other things, the MCA Agreement is designed to result in a default in the event that Wyldewood's business suffers any downturn in sales by (1) forcing Wyldewood to wait until a specified day of each month before entitling it to invoke the reconciliation provision, (2) preventing Wyldewood from obtaining other financing, (3) and requiring Wyldewood to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Wyldewood.

### Wyldewood and its Businesses, Finances, and Credit
### Have Been Demolished as a Result of Torro's Conduct

71. Torro and Wyldewood's other MCA Lenders collectively, inflicted immense financial and personal harm upon Plaintiffs who they purport to help.

72.     Torro pressured Plaintiffs into deceptive and lopsided agreements, loan money to Plaintiffs at triple-digit interest rates, Wyldewood having to look to other similar merchant cash advance lenders which resulted in the spiral of unending debt we see here.

73.     Torro is responsible for the fraudulent, and illegal conduct set forth herein.

74.     Additionally, once the MCA Agreement was executed, Torro took $5,000 from the Purchase Price for fees, only wiring Wyldewood $70,000.00.

75.     Torro began taking the Initial Daily Installment from Wyldewood's account, but Wyldewood was only able to make 12 payments totaling $11,172.00 before it could no longer sustain making the daily payments.

76.     After that default occurred, Torro filed suit against Plaintiffs in the Fifth Judicial District Court, in Washington County, Utah styled *Torro, LLC v. Wyldewood Cellars, Inc., et al*, Case #210500340 ("Utah Case") and obtained a default judgment against Plaintiffs on July 7, 2021 ("Judgment"). That Judgment was for $118,699.00, plus costs of the lawsuit, attorney fees, and a judgment interest rate of 16% per annum. *See* Judgment entered on July 7, 2021 attached as Exhibit 3.

77.     Then, Torro caused the Judgment to be registered in Johnson County District Court in a case styled *Torro, LLC v. Wyldewood Cellars, Inc.*, Case #22 CV 1664 ("Johnson Co. Case") and issued several garnishments from the case, including a garnishment issued on May 6, 2022 to Carson Bank which seized $3,141.19.

78.     Torro also obtained garnishment orders on July 8, 2022 in the Johnson Co. Case as well.

## FIRST CAUSE OF ACTION
## (RICO:  18 U.S.C. § 1962)

79.     Plaintiffs adopt and re-allege paragraphs 1 through 78 as if fully set forth herein.

**A.     The Unlawful Activity.**

80.     Under RICO, predicate offenses that constitute a racketeering activity is mail and wire fraud.

81.     "To support the mail and wire fraud allegations, the plaintiffs must plausibly allege 'the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises,' and that [defendants] communicated, or caused communications to occur, through the U.S. mail or interstate wires to execute that fraudulent scheme." *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp. 3d 982, 991 (D. Kan. 2018) *citing George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016).

82.     Here, in the MCA Agreement, Torro made multiple representations to Wyldewood and Brewer that were false, including, but not limited to:

a.     the Initial Daily Installment was a good faith approximation of the percentage (12%) of Wyldewood's recovery of its receivables;

b.     That Wyldewood had the right to a reconciliation of its Daily Installment Payment which would result in the crediting back of any overpayment of Wyldewood's receivable receipts (*See* p. 3, Section 10 of the MCA Agreement));

c.     That Torro would not collect any interest from Wyldewood on the Purchase Price Torro provided to Wyldewood (*See* p. 5, Section 16(a)(ii) of the MCA Agreement (Ex. 1));

d.     That the MCA Agreement was "not the borrowing of funds" and "not a loan", but rather an agreement to purchase Wyldewood's future receivables (*See* p. 5, Section 16(a)(ii) and p. 6, Section 16(d) of the MCA Agreement (Ex. 1));

83.     However, the Initial Daily Installment of $931.25 established under the MCA Agreement was not a good faith approximation of Wyldewood's actual receipts, but rather a calculation by Torro to recover the "Purchase Price" in 120 days.

84.     Next, the provisions in the MCA Agreement involving reconciliation was a sham. Wyldewood's request for a reconciliation was ignored.

85.     Torro has sought to collection interest on the Purchase Price, both in the lawsuit it filed against Wydlewood in Utah and in seeking to recover $119,504.00 in May 26, 2022 UCC notice Torro sent Wyldewood's customers. *See* UCC Notice at Ex. 2.

86.     Finally, as more fully set forth above, the MCA Agreement was a loan.

87.     The purpose of Torro's these representations was to induce Wyldewood and Brewer into the MCA Agreement and to ultimately obtain funds from Wyldewood or Wyldewood's customers.

88.     Torro used wire to make those representations.  Initially, the MCA Agreement was executed electronically and communicated through email exchanges.

89.     Torro's initially funding was wired to Wyldewood and the installments payments made to Torro were withdrawn by ACH.

90.     Torro also used mail to send its UCC Lien Notices to Wyldewood's customers.

**B.     Culpable Persons.**

91.     Torro, as well as its various officers and owners, and the investors in Torro, who participated in this illegal scheme (and whose identities will be sought during the course of discovery in this case) are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

In the Thirtieth Judicial District, Sumner County District Court
*Wyldewood Cellars, Inc., et al v. Torro, LLC*
Case No. 22 CV
PETITION
Page | 20

92.     At all relevant times, each of the various officers, owners, and investors of Torro (the "RICO Persons") was, and is, a person that exists separate and distinct from Torro itself.

93.     The officers of Torro, who will be identified through discovery, manage and direct not just Torro, but one or more of the other MCA Lenders and knowingly participated in the enterprise and the fraudulent scheme described above.

94.     The owners of Torro and the other MCA Lenders, who will be identified through discovery, have an ownership interest in Torro or in Torro and other MCA Lenders and knowingly participated in the enterprise and the fraudulent scheme described above.

95.     The investors of Torro, who will be identified through discovery, invest capital into Torro or into Torro and the other MCA Lenders, and receive a significant return on his/her/its investment, and knowingly participated in the enterprise and the fraudulent scheme described above.

96.     Through their operation of Torro, the RICO Persons solicit, underwrite, fund, service and collect upon unlawful debt procured by wire and mail fraud.

**C.     The Enterprise**

97.     Torro, together with its respective as officers, owners, and investors, constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Enterprise").

98.     Torro, together with its respective as officers, owners, and investors, are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing, and collecting upon loans that are procured by fraud.

99.     The members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating

to and for the purpose of originating, underwriting, servicing and collecting upon MCAs issued by the Enterprise to small businesses throughout the United States, which constitutes a racketeering active.

100.    The merchant case advances provided by Torro, including such the MCA evidenced by the MCA Agreement, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(1) because Torro's merchant cash advances constitute mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

101.    Torro and the various other members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

102.    Each Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the Roles of Torro within the Enterprise.**

103.    The RICO Persons of each Enterprise have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

1.    *The Owners and Officers*

104.    The owners and officers of Torro are the masterminds of the Enterprise. They are responsible for the day-to-day operations of the Enterprise and have final say on all business

decisions of the Enterprise including, without limitation, which merchant cash advances the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each merchant cash advance.

105. In such capacity, the owners and officers of the Enterprise are responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the merchant cash advances as receivable purchase agreements to conceal their fraudulent activity and (ii) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Plaintiffs here.

106. The owners and officers of the Enterprise also take actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the fraudulently obtained loans and executing legal documents in support of the Enterprise.

107. The owners and officers of each Enterprise have ultimately benefited from the Enterprise's funneling of the fraudulently obtained loan proceeds to the owners and investors.

2. *Torro*

108. Torro is a limited liability company organized under the laws of the state of Utah. Torro maintains officers, books, records, and bank accounts independent of the owners, officers and investors of the Enterprise.

109. Torro operated as part of an unlawful enterprise to collect upon fraudulently obtained loans and commit wire fraud. Pursuant to its membership in an Enterprise, the owners

and officers of the Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's fraudulent loans and participation agreements with the Investors to fund the fraudulent loans; (ii) pooled the funds of Investors in order to fund each fraudulent loan; (iii) underwritten the fraudulent loans and determining the terms of collection on each fraudulent loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the fraudulent loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the fraudulent debt; and (v) obtained judgments in its name to further collect upon the fraudulent loans.

110.     In this case, the owners and officers of the Enterprise and the Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the MCA Agreement; (iii) underwrote the MCA Agreement; (iv) entered into the MCA Agreement; and (v) collected upon the fraudulent debt evidenced by the MCA Agreement by effecting daily ACH withdrawals from the bank accounts of one or more of the Plaintiffs.

3.     *The John/Jane Doe Investors*

111.     The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Torro.

112.     Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Torro and other MCA Lenders with all or a portion of the pooled funds necessary to fund the fraudulent loans, including the MCA Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawfully procured debts by, among other things, approving early payoff terms, settlement agreements, and other financial arrangements with borrowers to collect upon the fraudulent debt.

113.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawfully-procured debts are funneled to the Investors according to their level of participation in the fraudulent loans.

**E.    Interstate Commerce**

114.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

115.    Specifically, members of the Enterprise maintain offices in Utah and various other states and use personnel in these offices to originate, underwrite, fund, service, and collect upon the fraudulent loans made by the Enterprise to entities in Kansas, and throughout the United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

116.    In the present case, much of the communications between the members of each Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.  Specifically, each Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advance under the MCA Agreement, and collect the Initial Daily Installments via interstate electronic ACH debits.

**F.    Injury and Causation.**

117.    Each Plaintiff has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

118.    The injuries to each Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected loan payments and the unlawful entry and enforcement of judgments.

119.    Each Plaintiff has also suffered damages by incurring attorney fees and costs associated with exposing and prosecuting Defendants' criminal activities.

120.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorney fees from Defendants.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against Torro for any and all damages Plaintiffs have incurred as a result of Torro's actions; that the Court award Plaintiffs treble damages as allowed by RICO and other applicable law; that the Court award Plaintiffs any attorney fees and expenses they incur in connection with this action; and that the Court enter such other and further relief as it deems just and equitable.

## SECOND CAUSE OF ACTION
### (CONSPIRACY UNDER 18 U.S.C. § 1962(d))

121.    Plaintiffs adopt and re-allege paragraphs 1 through 120 as if fully set forth herein.

122.    Torro has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of the Enterprise, to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

123.    By and through Torro's business relationships with the other members of the Enterprise, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among Torro, its owners, officers and investors, concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, Torro knew the nature of the Enterprise and knew that the Enterprise extended beyond Torro's individual role. Moreover, through the same connections and coordination, Torro knew that the other owners, officers, and investors in the Enterprise were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. §§ 1962(c).

124.    Torro agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon the fraudulent debts, including the MCA Agreement, in violation of 18 U.S.C. §§ 1962(c).  In particular, Torro was a knowing, willing, and active participant in Enterprises and its affairs, and each of the

125.    Torro, its owners, officers, and directors who participated in the Enterprise shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements within that Enterprise.

126.    Torro agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit mail and wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

127.    The participation and agreement of Torro, its owners, officers, and investors in the Enterprise was necessary to allow the commission of this scheme.

128.    Plaintiffs have been and will continue to be injured in their business and property by reason of Torro's violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

129.    The injuries to Plaintiffs are directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments from Plaintiffs and others.

130.    Plaintiffs have also suffered damages by incurring attorney fees and costs associated with exposing and prosecuting Defendants' criminal activities.

131.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorney fees from Torro.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against Torro for any and all damages Plaintiffs have incurred as a result of Torro's actions; that the Court award Plaintiffs treble damages as allowed by RICO and other applicable law; that the Court award Plaintiffs any attorney fees and expenses they incur in connection with this action; and that the Court enter such other and further relief as it deems just and equitable.

### THIRD CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT)

132. Plaintiffs adopt and re-allege paragraphs 1 through 131 as if fully set forth herein.

133. Although Wyldewood sells some of its wine directly to consumer, a majority of its wine is sold through various vendors through the United States.

134. Vinoshipper, an internet-based wine seller, and Standard Beverage are two of Wyldewood's biggest customers.

135. In May 2016, Wyldewood maintained contracts with certain customers, including Vinoshipper and Standard Beverage, to provide products and services so that product could be resold to customers.

136. Torro knew that Wyldewood maintained regular and recurring contracts with its customers, including Vinoshipper and Standard Beverage, to purchase products from Wyldewood.

137. On May 16, 2022, Torro sent a "UCC Lien Notice" to various customers, including Vinoshipper and Standard Beverage, demanding that the customer pay any amounts due to Wyldewood to Torro instead. *See* Ex. 2.

138. At the time Torro sent the UCC Lien Notice, Torro knew or should have known that the MCA Agreement contained multiple fraudulent misrepresentation, that the MCA

In the Thirtieth Judicial District, Sumner County District Court
*Wyldewood Cellars, Inc., et al v. Torro, LLC*
Case No. 22 CV
PETITION
Page | 28

Agreement violated RICO, and that the security interest granted to Torro in the MCA Agreement was procured by fraud.

139.    Through the very little due diligence Torro perform and a cursory search of the Kansas UCC-1 Financing Statement, Torro also knew or should have known that if it even maintained a security interest in Wyldewood's receivables, any such interest that Torro maintained was junior and inferior to other loans.

140.    Torro knew or should have known that the amount it claims was due and owing exceeded any balance Torro should reasonably recover under the MCA Agreement.

141.    Despite such knowledge, actual or constructive, Torro still sent to the UCC Lien Notice to Wyldewood's customers.

142.    Torro had no legitimate justification, business or otherwise, in sending the UCC Lien Notice Wyldewood's customers. The main, if not the sole, purpose of sending the UCC Lien Notice to Wyldewood's customers was to interfere with Wyldewood's business operations and to harm Wyldewood's financial status. In other words, Torro sent the UCC Lien Notice to pressure Wyldewood to either pay Torro the exorbitant amount Torro claimed was due or for Wyldewood to close its business.

143.    Both Vinoshopper, Standard Beverage, and other eventually paid out on the contracts Wyldewood had with them, but it caused the payment to be delayed by more than 4 months.

144.    Wyldewood's customers who received Torro's UCC Lien Notice, including, but not limited to Vinoshipper and Standard Beverage, also held off ordering any additional product from Wyldewood until Wyldewood's issues with Torro was resolved.

145.    The delay in payment and the ordering of product caused damage to Wyldewood, including, but not limited to, impacting Wyldewood's financial stability by causing delays in the recovery of revenue and the lost opportunity to sell additional product during that period of time.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against Torro for any and all damages Plaintiffs have incurred as a result of Torro's intentional interference with Plaintiffs' contracts; that the Court award Plaintiffs any attorney fees and expenses they incur in connection with this action to the extent allowed by applicable law; and that the Court enter such other and further relief as it deems just and equitable.

## FOURTH CAUSE OF ACTION
### (DECEPTIVE ACTS – KANSAS CONSUMER PROTECTION ACT)

146.    Plaintiffs adopt and re-allege paragraphs 1 through 145 as if fully set forth herein.

147.    The Kansas Consumer Protection Act ("KCPA") defines a "consumer" as "…any individual, corporation, government, government subdivision or agency, business trust, estate, trust, partnership, associations, cooperative or other legal entity." *See* KAN. STAT. ANN. § 50-624.

148.    Both Plaintiffs constitute consumers under the KCPA. Wyldewood is a corporation established under Kansas law and Brewer is an individual who resides in Kansas.

149.    The KCPA defines a "consumer transaction" as "…a sale, lease, assignment or other disposition for value of property or services within the state of Kansas to a consumer…" *See* KAN. STAT. ANN. § 50-624.

150.    The MCA Agreement constitutes a consumer transaction between Torro and Plaintiffs.

151.    Under the MCA Agreement, even though it is in reality a loan, there was a disposition of property for value between Torro and the Plaintiffs. Torro agreed to provide

Plaintiffs certain funds in exchange for Wyldewood's repayment of an amount in exchange for Torro providing those funds.

152. Alternatively, if it is determined that Torro did indeed purchase future receivables from Wyldewood, there was certainly a dispositive of property for value. Wyldewood sold future receivables to Torro in exchange for the payment of $75,000.00.

153. There was even an exchange for value between Torro and Brewer. Torro agreed to provide Wyldewood certain funds in exchange for Brewer's personal guaranty of Wyldewood's performance under the MCA Agreement.

154. The KCPA defines a "supplier" as "…a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." *See* KAN. STAT. ANN. § 50-624.

155. Torro is a supplier under the KCPA because in its ordinary course of business Torro engages and enters into agreements almost identical to the MCA Agreement with its customers.

156. Torro committed several deceptive acts with Plaintiffs in violation of KAN. STAT. ANN. § 50-626.

157. First, Torro represented to Plaintiffs several times in the MCA Agreement that the MCA Agreement was not a loan.

158. However, the MCA Agreement was, in fact, a loan.

159. At the time Torro made the representation that the MCA Agreement was not a loan, Torro knew or should have known that the MCA Agreement was a loan.

160.   As a matter fact, Torro intentionally setup the MCA Agreement to operate as loan, but made the representations that it was not a loan to avoid any statutory or regulatory restrictions on Torro providing loans.

161.   Second, Torro represented to Plaintiffs in the MCA Agreement that the Initial Daily Installment of $931.25 was a good faith approximation of 12% of Wyldewood's future receipts.

162.   However, the Initial Daily Installment was not a good faith approximation of 12% of Wyldewood's future receipts, but rather the daily payment amount necessary to pay Torro the "Purchase Price" of $111,750.00 in 120 days.

163.   Torro knew or should have known that the Initial Daily Installment of $931.25 was not a good-faith approximation of 12% of Wyldewood's future receipts.

164.   Third, the MCA Agreement contains a process for Wyldewood to reconcile its Initial Installment Payment to match Wyldewood's actual receivable receipts in a given month.

165.   However, Wyldewood could not seek such a reconciliation because, in reality and practice, no such reconciliation process exists or would ever be performed.

166.   Torro knew or should have known at the time it included the reconciliation rights in the MCA Agreement that no such reconciliation process exists or would be performed.

167.   Torro merely included the reconciliation process in an attempt to avoid the MCA Agreement being considered a loan and the statutory or regulatory restrictions on Torro that would be place if Torro provided loans.

168.   Wyldewood suffered harm as a result of Torro's deceptive acts under KAN. STAT. ANN. § 50-634.  Wyldewood was induced into executing the MCA Agreement based on these deceptive acts and made multiple Initial Daily Installments to Torro under the MCA Agreement.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against Torro for any and all damages Plaintiffs have incurred as a result of Torro's deceptive acts or civil penalties of up to $10,000.00 for each deceptive act, whichever is greater; that the Court award Plaintiffs any attorney fees and expenses they incur in connection with this action to the extent allowed by KAN. STAT. ANN. § 50-634; and that the Court enter such other and further relief as it deems just and equitable.

### FIFTH CAUSE OF ACTION
### (UNCONSCIONABLE ACTS – KANSAS CONSUMER PROTECTION ACT)

169.    Plaintiffs adopt and re-allege paragraphs 1 through 168 as if fully set forth herein.

170.    In addition to committing multiple deceptive acts, Torro committed multiple unconscionable acts in violation of KAN. STAT. ANN. § 50-627 as well.

171.    First, Plaintiffs did not receive any material benefit from the MCA Agreement. At the time Wyldewood entered into the MCA Agreement, Wyldewood was in the cycle of borrowing funds from one MCA Lender just in order to have the funds necessary to make the daily payments required by the previous MCA Lender. This cycle is very familiar to the MCA industry and most likely familiar to Torro.

172.    It was evident from Wyldewood's bank statements and a simply UCC search that Wyldewood was in the above-mentioned cycle and that the funds received under the MCA Agreement would not have benefitted Wyldewood or its operations in any material way.

173.    Even with the paltry due diligence Torro actually performed, Torro knew or should have known that Wyldewood would receive no material benefit from the "Purchase Price".

174.    Second, at the time Plaintiffs entered into the MCA Agreement, there was no reasonable probability of payment of the "Purchase Price" by Wyldewood.

175.    When Wyldewood entered into the MCA Agreement with Torro in late March 2021, Wyldewood had 4 other MCA Lenders with 5 MCA agreements who were taking daily ACH payments from Wyldewood. The total payments on the MCA agreements was $5,382.63, which equates to monthly payments totaling $107,603.00.

176.    The fact that these payments were being made would have been evident in Wyldewood's bank statements it provided to Torro in connection with the application process. Given that, Torro knew or should have known at the time the MCA Agreement was executed that Wyldewood was not going to be able to make the Initial Daily Installment.

177.    Third, the MCA Agreement was excessively one-sided in favor of Torro in violation of KAN. STAT. ANN. § 50-626(b)(5).

178.    Initially, under the MCA Agreement, the effective interest rate Wyldewood agreed to pay Torro was 149% per annum.

179.    Wyldewood also agreed to several restrictions regarding its operations, including to only use an "Approved Bank Account" (p. 3, Section 7 of Ex. 1); to inform Torro of any adverse changes in its operations (p. 7, Section 21(a) of Ex. 1); to continue to maintain workers' compensation insurance (p. 7, Section 21(f) of Ex. 1); to maintain business-interruption insurance (p. 7, Section 21(g) of Ex. 1); to not change its name or transfer ownership (p. 7, Section 21(j)); and to not close its business for any reason (p. 7, Section 21(m) of Ex. 1).

180.    Finally, Wyldewood also granted or waived a lot of rights Wyldewood would ordinarily have, including giving Torro power of attorney (p. 10, Section 32 of Ex. 1); allowing Torro electronic access to Wyldewood's bank accounts (p. 3, Sections 7 & 8 and Attachment A of Ex. 1); agreed to pay Torro "Reasonable Damages" if Wyldewood defaulted that bore no

relationship to any actual damages Torro would potentially suffer under any Wyldewood default (p. 9, Section 29 of Ex. 1); agreed to indemnify Torro for any damages (p. 10, Section 36 of Ex. 1); supposed waived liability "…under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental or consequential damages…" (p. 10, Section 37 of Ex. 1); waived any right to jury trial (p. 11, Section 47 of Ex. 1); waived any right to bring a class action(p. 11, Section 48 of Ex. 1); and waived any rights to be personally served with any suit brought by Torro (p. 11, Section 50 of Ex. 1).

181. Brewer guaranteed Wyldewood's performance of all these obligations without him even receiving any portion of the "Purchase Price".

182. In addition to that performance guaranty, Brewer agreed not to sell or transfer any of his personal business assets (p. 13, Section 4 of Ex. 1); to waive any rights he might have to a jury trial (p. 14, Section 8 of Ex. 1); to waive any rights to initiate a class action case (p. 14, Section 9, of Ex. 1); and any right he had to demand personal service on him (p. 15, Section 11 of Ex. 1).

183. Plaintiffs were aggrieved as a result of Torro's actions as required by KAN. STAT. ANN. § 50-634.

184. Wyldewood was aggrieved by Torro's actions in several ways. First, Wyldewood lost the Initial Daily Installments it paid to Torro as well as the funds in its bank accounts Torro obtained in connection with a garnishment order.

185. Wyldewood also suffered lost opportunities because of the delays caused by Torro's attempt to enforce the "rights" Torro obtained based on its unconscionable acts and sending the UCC Lien Notice. Torro's actions also impacted Wyldewood's reputation among its customers due to Torro's attempts to enforce its UCC Lien Notice.

186.     Brewer is also aggrieved because he has suffered loss and injury as a result of

Torro's unconscionable acts.  Brewer has suffered anxiety over the impact of the MCA Agreement

on Wyldewood's operations, felt threatened by Torro's claims against him, and has lost many

hours of work having to take action to address Torro's actions.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against

Torro for any and all damages Plaintiffs have incurred as a result of Torro's unconscionable acts

or civil penalties of up to $10,000.00 for each act, whichever is greater; that the Court award

Plaintiffs any attorney fees and expenses they incur in connection with this action to the extent

allowed by KAN. STAT. ANN. § 50-634; and that the Court enter such other and further relief as it

deems just and equitable.

## SIXTH CAUSE OF ACTION
## (BREACH OF CONTRACT)

187.     Plaintiffs adopt and re-allege paragraphs 1 through 186 as if fully set forth herein.

188.     Assuming a valid contract existed, each MCA-Funder Defendant breached the

respective and applicable MCA Agreement by:

a.     Refusing to reconcile the daily payments and have such payments be a true

reflection of the daily receipts based on the amount of receivables allegedly purchased;

b.     Not funding the amount required under the respective agreement; and

c.     Seeking to recover interest on the Purchased Amount.

189.     Each Plaintiff suffered damages as a direct and proximate result of Torro's breach.

WHEREFORE Plaintiffs pray that the Court enter judgment in their favor and against

Torro for any and all damages Plaintiffs have incurred as a result of Torro's breaches of the MCA

Agreement; that the Court award Plaintiffs any attorney fees and expenses they incur in connection

In the Thirtieth Judicial District, Sumner County District Court
*Wyldewood Cellars, Inc., et al v. Torro, LLC*
Case No. 22 CV
PETITION
Page | 36

with this action to the extent allowed the MCA Agreement and applicable law; and that the Court

enter such other and further relief as it deems just and equitable.

RESPECTFULLY SUBMITTED:

HINKLE LAW FIRM LLC

/s/ Nicholas R. Grillot
Nicholas R. Grillot, #22054
1617 N. Waterfront Pkwy, Suite 400
Wichita, Kansas 67206-6639
Phone: (316) 660-6211 / Fax: (316) 660-6523
Email: ngrillot@hinklaw.com
*Attorneys for Wyldewood Cellar, Inc. &*
*John Brewer*



# Torro, LLC

5965 South 900 East Suite 300, Murray, UT 84121

**EXHIBIT 1**

## SECURED MERCHANT AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES

This agreement (this "Agreement"), dated March 24th, 2021 , between Torro, LLC ("TLLC") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

| | | | | | |
|---|---|---|---|---|---|
| **Business Legal Name:** | WYLDEWOOD CELLARS, INC. | | | | |
| **D/B/A:** | WYLDEWOOD CELLARS | | | | |
| **Type of Entity:** | Corporation | | | | |
| **Physical Address:** | 951 E. 119th St. S. Peck, KS 67120 | | | | |
| **Mailing Address:** | 1374 N. Hydraulic Rd. Mulvane, KS 67110 / PO Box 45 Mulvane, KS 67110 | | | | |
| **EIN #:** 48-1159134 | **Business Phone #:** | (316) 777-2122 | | **Home Phone #:** | (316) 777-2122 |

| | | | | |
|---|---|---|---|---|
| **Purchase Price:** | 75,000.00 | **Purchased Amount:** | 111,750.00 | |
| **Specified Percentage:** | 12 | **Daily Amount:** | 931.25 | |

| | | | |
|---|---|---|---|
| **For Seller #1 (print full name):** | John A. Brewer | **Signature:** | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
| **SSN:** | ☒☒☒☒-1476 | **Title:** | OWNER/AGENT/MANAGER |

| | | | |
|---|---|---|---|
| **For Seller #2 (print full name):** | | **Signature:** | |
| **SSN:** | | **Title:** | OWNER/AGENT/MANAGER |

**\*Accurate contact information is required to provide the Seller with important information regarding the Agreement.** Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to TLLC by the following Owner(s)/Guarantor(s) of Seller.

| | | | |
|---|---|---|---|
| **For Owner/Guarantor #1 (print full name)** | John A. Brewer | **Signature:** | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
| **SSN:** | ☒☒☒☒-1476 | **Title:** | OWNER/AGENT/MANAGER |

| | | | |
|---|---|---|---|
| **For Owner/Guarantor #2 (print full name)** | | **Signature:** | |
| **SSN:** | | **Title:** | OWNER/AGENT/GUARANTOR |

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto as Exhibit B (the "Addendum").

**WHEREAS**, Seller is desirous to sell to TLLC, and TLLC is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, TLLC and Seller hereby agree to the foregoing and as follows:

**1. Basic Terms and Definitions.**

Guarantor #1 Initials: *JAB*     Guarantor #2 Initials: _____

**a.** "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when TLLC paid the Purchase Price to Seller.

**b.** "Specified Percentage" shall mean 12 _____ (12 %) of each and every sum from sale made by Seller of Future Receipts.

**c.** "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

**d.** "Daily Receipts" shall mean the amount of Future Receipts received by Seller on a daily basis.

**e.** "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to TLLC pursuant to this Agreement. The parties agree that the Purchased Amount shall be $111,750.00 .

**f.** "Purchase Price" shall mean the total amount that TLLC agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from TLLC pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i., j. and k. below. The parties agree that the Purchase Price shall be $ 75,000.00 .

**g.** "Initial Daily Installment" shall mean the fixed amount that Seller and TLLC agree to be a good faith approximation of the Specified Percentage of Seller's Daily Future Receipts. Seller and TLLC further agree that, based upon the information provided by Seller to TLLC concerning Seller's most recent accounts receivables, including representations by the Seller to TLLC regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement, as of the Effective Date the Initial Daily Installment shall be $ 931.25 .

**h.** "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**i.** "Applicable Fees" shall mean, collectively, all initial costs and fees that Seller agrees to pay to TLLC as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**j.** "Prior Balance" shall mean the sum of all amounts that Seller may owe to TLLC and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**k.** "Origination Fee" shall mean the fee that Seller and a Broker have agreed to in conjunction with brokering this Agreement, which amount Seller authorizes TLLC to withhold from the Purchase Price and pay to said Broker. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**l.** In the event "Seller" is comprised of more than one entity, then:

**i.** The term "Seller" shall mean, individually and collectively, all such entities; and

**ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

**iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** The terms "Specified Percentage", "Future Receipts", "Daily Receipts", "Initial Daily Installment" shall mean the Specified Percentage, the Future Receipts and the Daily Receipts of each Seller individually; and

**vi.** TLLC may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**m.** In the event "Guarantor" is comprised of more than one individual, then:

**i.** The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.** Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several

*JAB*

Guarantor #1 Initials: JAB _____    Guarantor #2 Initials:_____

under this Agreement and the Guaranty; and

**iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** TLLC may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2. The Term**. This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to TLLC pursuant to this Agreement are received by TLLC in full.

**3. Sale of Purchased Future Receipts**. Seller hereby sells, assigns, transfers, and conveys (hereinafter, the "Sale") unto TLLC all of Seller's right, title, and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to TLLC (hereinafter, the portion of the Future Receipts sold by Seller to TLLC pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto TLLC, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to TLLC of collectability of the Purchased Future Receipts by TLLC and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to TLLC full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4. Payment of Purchase Price**. In consideration of the sale by Seller to TLLC of the Purchased Future Receipts pursuant to this Agreement, TLLC agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5. Use of Purchase Price**. Seller hereby acknowledges that it fully understands that: (i) TLLC's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to TLLC in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business TLLC's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6. Initial Daily Installments of Purchased Amount**. The Purchased Amount shall be delivered by Seller to TLLC daily in the amount of the Initial Daily Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

**7. Approved Bank Account and Credit Card Processor**. During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by TLLC (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by TLLC (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be. Seller acknowledges and agrees that any change in the Approved Bank Account or Credit Card Processor is subject to a $50 bank change as TLLC is required to make the necessary system and account adjustments.

**8. Authorization to Debit Approved Bank Account**. Seller hereby authorizes TLLC to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed on Appendix A hereto) in the amount of the Initial Daily Installment on each Workday commencing on the Effective Date until TLLC receives the full Purchased Amount. Seller shall provide TLLC with all access code(s) for the Approved Bank Account. Seller acknowledges and understands that a $39 ACH restricted account fee will be added for each day that TLLC is unable to access the Approved Bank Account via the credentials Seller has provided.

**9. Fees Associated with Debiting Approved Bank Account**. It shall be Seller's exclusive responsibility to pay to its banking institution and/or TLLC's banking institution directly (or to compensate TLLC, in case it is charged) all fees, charges and expenses incurred by either Seller or TLLC due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $50.00 charge per bounced or rejected ACH debit.

**10. Seller's Right for Reconciliation**. Seller and TLLC each acknowledge and agrees that:

**a.** If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Daily Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by TLLC (each such calendar month, a "Reconciliation Month").

**b.** Such reconciliation (the "Reconciliation") of the Seller's Initial Daily Installment for a Reconciliation Month shall be performed by TLLC within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by TLLC from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

**c.** One or more Reconciliation procedures performed by TLLC may reduce or increase the effective Initial Daily Installment

Guarantor #1 Initials: _JAB_     Guarantor #2 Initials: _____

amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which TLLC will be debiting the Approved Bank Account may get shortened or extended indefinitely.

## 11. Request for Reconciliation Procedure.

a. It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Daily Installments during any Reconciliation Month by sending a request for Reconciliation to TLLC.

b. Any such request for Reconciliation of the Seller's Initial Daily Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement and credit card processing statements for the Reconciliation Month at issue, and shall be received by TLLC via email to billing@torro.com, with the subject line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by TLLC).

c. TLLC's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

d. Commencing thirty (30) days after the Effective Date of this Agreement, Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and TLLC shall comply with each such request, provided that:

i. Each such request is made in accordance with the terms of this Section 11; and

ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by TLLC from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

e. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with TLLC's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by TLLC in full, or (ii) modify the amount of the Initial Daily Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

## 12. Adjustment of the Initial Daily Installment. Seller and TLLC each acknowledge and agree that:

a. If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Daily Installment that Seller is obligated to deliver daily to TLLC in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Daily Installment (the "Adjusted Daily Installment") shall replace and supersede the amount of the Initial Daily Installment set forth in Section 1 above.

b. The Adjustment of the Initial Daily Installment shall be performed by TLLC within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Daily Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

c. One or more Adjustments performed by TLLC may substantially extend the term of this Agreement.

## 13. Request for Adjustment Procedure.

a. It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to TLLC.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of TLLC's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to TLLC based upon which statements the amount of the Initial Daily Installment set forth in Section 1 above (or the then current Adjusted Daily Installment, as the case may be) was determined, and shall be received by TLLC by email at billing@torro.com, with the subject line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by TLLC).

c. TLLC's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

d. Seller shall have the right to request Adjustment of the Initial Daily Installment, or the Adjusted Daily Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and TLLC shall comply in good faith with such request, provided that:

i. Each such request for Adjustment is made in accordance with the terms of this Section 13; and

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials: _____

**ii.** A request for Adjustment shall not be made after the Expiration Date.

**e.** Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with TLLC's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by TLLC in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

## 14. Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

**a.** Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from TLLC of the Purchase Price, and upon obtaining TLLC's prior written consent, to accelerate delivery to TLLC of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

**b.** The Outstanding PAFR can only be delivered in full and not partially.

**c.** Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying TLLC to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

**d.** TLLC shall respond to Seller's request within three (3) Workdays from the date of its receipt by TLLC.

**e.** In its response to Seller's request, TLLC shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

**f.** As of the date agreed upon as between TLLC and Seller, Seller shall deliver to TLLC the full amount of the Outstanding PAFR (such date, the "Accelerated Delivery Date").

**g.** Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to TLLC of the Initial Daily Installments prior to the delivery of the Outstanding PAFR to TLLC.

**h.** Upon delivery of the Outstanding PAFR to TLLC in compliance with the provisions of this Section 14, Seller's obligations to TLLC pursuant to this Agreement shall be deemed completed and fulfilled.

## 15. Rights and Obligations of TLLC Upon Receipt of the Outstanding PAFR. Upon receipt of the full amount of the Outstanding PAFR:

**a.** TLLC shall notify the Approved Bank Account and request from it to stop transferring Initial Daily Installments to TLLC's bank account.

**b.** If TLLC shall have received one or more Initial Daily Installment (or Adjusted Daily Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing TLLC's request described in subparagraph (a) above or for any other reason), TLLC shall immediately do one of the two following things (but not both):

**i.** Return to Seller the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the date of delivery of the Outstanding PAFR to TLLC; or

**ii.** Apply the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date toward Seller's outstanding financial obligations to TLLC existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

**A.** By way of example, if as of the Accelerated Delivery Date, Seller and TLLC would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event TLLC may, in its sole and absolute discretion, apply the sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to TLLC pursuant to the Unrelated Future Agreement.

**c.** Seller acknowledges and agrees that TLLC shall have the right to apply the total sum of the Initial Daily Installments (or Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date toward Seller's outstanding financial obligations to TLLC existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, TLLC granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

## 16. Risk Sharing Acknowledgments and Arrangements.

**a.** Seller and TLLC each hereby acknowledges and agrees that:

**i.** The Purchased Future Receipts represent a portion of Seller's Future Receipts.

**ii.** This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from TLLC. TLLC does not charge Seller and will not collect from Seller any interest on the monies used by TLLC for the purchase of the Purchased Future Receipts. The period of time that it will take TLLC to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after TLLC's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, TLLC may never collect all

or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

**iii.** The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to TLLC.

**iv.** The amounts of Seller's future Daily Receipts may increase or decrease over time.

**v.** If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual daily amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Daily Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and TLLC may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

**b. TLLC's Risk Acknowledgments**. TLLC agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and TLLC assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give TLLC a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, TLLC hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):

**i.** adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

**ii.** loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

**iii.** bankruptcy of Seller; and/or

**iv.** natural disasters or similar occurrences beyond Seller's control.

**c. Application of Amounts Received by TLLC.** TLLC reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to TLLC from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

**d. Not a Loan**. Seller and TLLC agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by TLLC is not intended to be, nor shall it be construed as, a loan from TLLC to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, TLLC's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to TLLC in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that TLLC has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by TLLC shall automatically be reduced to the maximum rate permitted by applicable law and TLLC shall promptly refund to Seller any interest received by TLLC in excess of the maximum lawful rate.

**17. Applicable Fees**. Seller acknowledges that the Applicable Fees were agreed upon between Seller and TLLC prior to Seller entering into this Agreement, were subject to arm-length negotiation between TLLC and Seller, and a detailed list of the Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18. Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless TLLC for any and all damages and losses (including without limitation legal fees and expenses) incurred by TLLC as the result of such representation being untrue, incorrect or incomplete.

**19. Origination Fee**. To the extent that Seller has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Seller hereby requests and agrees for TLLC to withhold from the Purchase Price, and pay to the third-party broker associated with this Agreement, the Origination Fee contained in Rider 3, which is attached hereto and made a part hereof.

**20. No Reduction of Purchase Price**. Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.** Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

Guarantor #1 Initials: _JAB_     Guarantor #2 Initials:_____

**a. Financial Condition and Financial Information**. Seller's bank and financial statements, copies of which have been furnished to TLLC, and future statements which may be furnished hereafter pursuant to this Agreement or upon TLLC's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise TLLC of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. TLLC may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to TLLC within five (5) Workdays. Seller's failure to do so, and/or cutting off TLLC's online access to the Approved Bank Account, is a material breach of this Agreement.

**b. Governmental Approvals**. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**c. Good Standing**. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization, and has full power and authority necessary to carry its business as it is now being conducted.

**d. Authorization**. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

**e. Accounting Records and Tax Returns**. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that TLLC is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f. Taxes; Workers Compensation Insurance**. Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

**g. Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming TLLC as loss payee and additional insured in the amounts and against risks as are satisfactory to TLLC and shall provide TLLC proof of such insurance upon request.

**h. Electronic Check Processing Agreement**. Seller shall not change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede TLLC's rights under this Agreement, without TLLC's prior written consent.

**i. No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without TLLC's written permission.

**j. Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and TLLC, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining TLLC's written consent.

**k. Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining TLLC's consent; or (ii) make or send notice of any intended bulk sale or transfer.

**l. No Closing of Business**. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of TLLC, and (ii) providing TLLC with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to TLLC. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until TLLC shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide TLLC ten (10) business days advance notice.

**m. No Pending Bankruptcy**. As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n. Estoppel Certificate**. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from TLLC to Seller, execute, acknowledge and deliver to TLLC and/or to any other person or entity specified by TLLC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as

Guarantor #1 Initials: _JAB_

Guarantor #2 Initials: _____

modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o. Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p. No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of TLLC.

**q. Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r. No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s. Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants TLLC the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants TLLC and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller further agrees to provide TLLC, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow TLLC to interview any of those parties.

**t. Phone Recordings and Contact.** Seller agrees that any call between Seller and TLLC and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with TLLC, its managers, employees and agents (collectively, the "TLLC Parties") and that Seller may be contacted by any of the TLLC Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the TLLC Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**u. Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**v. Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by TLLC.

**w. Consultation with Counsel.** The person(s) signing this Agreement on behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**x. TLLC's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining TLLC's consent, such consent may be withheld, granted or conditioned at TLLC's sole and absolute discretion.

**y. No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and TLLC with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by TLLC or any of the TLLC Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the TLLC Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

**z. No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, set forth in Sections 17-19 herein, TLLC is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Sections 17-19 hereof, such fee is not charged by TLLC. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

## PLEDGE OF SECURITY

**22. Pledge.** As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "**Obligations**"), Seller hereby pledges, assigns and hypothecates to TLLC (collectively, "Pledge") and grants to TLLC a continuing, perfected, and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

**a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform

Guarantor #1 Initials: _748_      Guarantor #2 Initials: _____

Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.** all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23. Termination of Pledge.** Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, TLLC will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24. Representations with Respect to Collateral.** Seller hereby represents and warrants to TLLC that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25. Further Assurances.** Upon the request of TLLC, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as TLLC may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26. Attorney-in-Fact.** Seller hereby authorizes TLLC at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints TLLC as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in TLLC's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse, and collect all instruments made payable to Seller.

## EVENTS OF DEFAULT AND REMEDIES

**27. Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    **a.** Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) to TLLC, and timely and in full payment to TLLC of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    **b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with TLLC (if any) which is related to the instant Agreement.

    **d.** Seller uses multiple depository accounts without obtaining prior written consent of TLLC in each instance.

    **e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of TLLC in each instance.

    **g.** Seller interferes with TLLC collection of Initial Daily Installments (or Adjusted Daily Installments, as the case maybe).

    **h.** Four (4) or more ACH transactions attempted by TLLC are rejected by Seller's bank.

    **i.** The Guaranty shall for any reason cease to be in full force and effect.

**28. Default under the Agreement.** In case any Event of Default occurs and is not waived by TLLC, in writing, TLLC may declare Seller in default under this Agreement without notice.

**29. Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to TLLC the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to TLLC, as additional damages, any reasonable expenses incurred by TLLC in connection with recovering the monies due to TLLC from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that TLLC shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as twenty-five percent (25%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or twenty-five hundred dollars ($2,500.00), whichever is greater. The entire sum due to TLLC pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 16.00% per annum (and such interest shall accrue daily). If Seller blocks Torro's ACH debit of the Approved Bank Account or Credit Card Processor, bounces more than 4 debits of the Approved Bank Account or Credit Card Processor, or simultaneously uses multiple bank accounts or credit card processors to process its receipts, than Seller is subject to an Unauthorized Account Fee of five thousand dollars ($5,000.00). Seller is subject to a $249.00 risk assessment fee in the Event of Default for TLLC's underwriting and assessing the method of collection to be used herein.

**30. Remedies Upon Default.** Upon Seller's default, TLLC may immediately proceed to protect and enforce its rights under this

Guarantor #1 Initials: _JAB_      Guarantor #2 Initials: _____

Agreement and/or Guaranty by:

**a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of TLLC's security interest;

**b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

**c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to TLLC of all or any portion of the amounts received by such credit card processor on behalf of Seller.

**d.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation TLLC's rights of a secured party under the UCC.

**31. Remedies are not Exclusive**. All rights, powers and remedies of TLLC in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to TLLC by law or equity.

**32. Power of Attorney.** Seller irrevocably appoints TLLC and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to TLLC from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code ("Account Debtors"), to make payment directly to TLLC (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which TLLC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount. Please see "Exhibit C" for all powers and authorities given to TLLC. TLLC will only execute "Exhibit C" upon occurrence of an Event of Default, otherwise it will not be applied or executed by any means.

## ADDITIONAL TERMS

**33. Seller Deposit Agreement**. Seller shall execute an agreement with TLLC that shall authorize TLLC to arrange for electronic fund transfer services and/or "ACH" payments of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) from the Approved Bank Account. Seller shall provide TLLC and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) TLLC and/or it's agent to deduct daily the amounts of the Initial Daily Installment (or the Adjusted Daily Installment, as the case may be) to TLLC from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to TLLC by permitting TLLC to withdraw the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34. Financial Condition**. Seller and its Guarantor(s) authorize TLLC and its agents to investigate their financial status and history, and will provide to TLLC any bank or financial statements, tax returns, etc., as TLLC deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. TLLC Seller hereby authorizes TLLC to receive from time to time updates on such information and financial status.

**35. Transactional History**. Seller shall execute written authorization(s) to their bank(s) to provide TLLC with Seller's banking and/or credit-card processing history. Upon request from Buyer, at any time that an obligation between buyer and seller exist, Buyer reserves the right to request that Seller provide Seller's Banking and/or credit-card processing history, as required by the extents herein.

**36. Indemnification**. Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by TLLC for monies owed to TLLC from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by TLLC.

**37. No Liability**. In no event shall TLLC be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

**38. Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39. Assignment**. TLLC may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining TLLC's written consent.

**40. Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties

Guarantor #1 Initials: *JAE*          Guarantor #2 Initials:_____

to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

**41. Waiver Remedies.** No failure on the part of TLLC to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42. Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43. Governing Law, Venue, and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Utah, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in Utah State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in Utah, that the Specified Percentage of the Future Receipts are being delivered to TLLC in Utah, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in Utah. Seller and its Guarantor(s) acknowledge and agree that Utah has a reasonable relationship to this transaction.

**44. Survival of Representation, etc**. All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45. Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46. Entire Agreement**. This Agreement embodies the entire agreement between Seller and TLLC and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

**47. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**49. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH TLLC, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA")  OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND TLLC SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**50. SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE UTAH STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON SELLER'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE**

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials:_____

AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN SELLER'S ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**51. Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ▨▨▨-1476 | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR**

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ▨▨▨-1476 | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
|---|---|
| Name: | |
| Title: | |

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of March 24th, 2021, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **Torro, LLC** ("Buyer").

**WHEREAS:**

A. Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of March 24th, 2021, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

**THE SELLER:** _____ and the entities listed on "Exhibit B"
**Legal Business Name:** WYLDEWOOD CELLARS, INC.
**D/B/A:** WYLDEWOOD CELLARS

B. Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

C. Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    a. any amendment, modification or extension of the Agreement or any Obligation;

    b. any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    c. any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    d. any other guaranty now or hereafter executed by Guarantor or anyone else;

    e. any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    f. any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    g. the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    h. the failure to give Guarantor any notice whatsoever;

    i. any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents

Guarantor #1 Initials: _JAB_       Guarantor #2 Initials:_____

that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty. Guarantor additionally consents to the ordering of a credit report for Guarantor (a) as a condition precedent to Buyer entering into this Agreement, (b) from time to time during the entire Term of the Agreement, and (c) in the event of default pursuant to the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of Utah without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in Utah State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in Utah, that the Specified Percentage of the Future Receipts are being delivered to Buyer in Utah, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in Utah. Guarantor acknowledges and agrees that it is guaranteeing a Utah agreement and transaction. Guarantor acknowledges and agrees that Utah has a reasonable relationship to this transaction.

**8. JURY WAIVER.** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**9. CLASS ACTION WAIVER.** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**10. ARBITRATION.** THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials:_____

**11. SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE UTAH STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON HIM/HER/THEM BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON GUARANTOR'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR SHALL PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN GUARANTOR'S ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.**

**12. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**14. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer* <br> John A Brewer (Mar 25, 2023 11:26 CDT) |
|---|---|---|---|
| SSN: | ◼◼◼-1476 | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
|---|---|
| Name: | |
| Title: | |

**RIDER 1**

# TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

## Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated March 24th, 2021

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the March 24th, 2021 Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**. The parties agree that the Applicable Fees which Seller shall pay to TLLC, pursuant to Section 17 of the Agreement shall be as follows:

a. **Due Diligence Fee:** Four to ten percent (10%) of the Purchase Price (the cost of the due diligence of Seller' business performed by TLLC. As a general rule, the Due Diligence Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc.).

b. **ACH Program Fee**: $395.00 (to cover expense of ACH processing program).

c. **UCC Fee**: $195.00 (part of filing UCC financing statements and their terminations).

d. **Wire Fee**: $35.00 (to cover cost of remitting the Purchase Price).

**4. Authorization**. Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to Section 17 of the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ▇▇▇-1476 | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

Guarantor #1 Initials: *JAB* Guarantor #2 Initials:_____

## RIDER 2

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated March 24th, 2021

## PRIOR BALANCE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

## TOTAL PRIOR BALANCE: $ 0.00

**4. Authorization.** Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to TLLC and/or the creditors listed in this Rider.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

**6. Indemnification.** Seller hereby indemnifies and holds harmless TLLC for any and all damages and losses (including without limitation legal fees and expenses) incurred by TLLC as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | XXXX-1476 | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

## RIDER 3

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated  March 24th, 2021

## ORIGINATION FEE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**. The parties agree that the Origination Fee that Seller shall pay to TLLC pursuant to Section 19 of the Agreement shall be:

$ 0.00

**4. Authorization**. Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | _John A Brewer_<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ▨▨▨-1476 | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

APPENDIX A

# ACH Authorization Form

All information on this form is required unless otherwise noted.

## Business Authorized to Debit/Credit Account (the "Buyer")

Authorized Business Name: Torro, LLC

Authorized Business Phone Number: (855) 586-1164

Authorized Business Address: 5965 S 900 E, Suite 300, Murray, UT 84121

## Business Information (the "Seller"):

Business Name:  WYLDEWOOD CELLARS, INC.

Business DBA:  WYLDEWOOD CELLARS

Business Phone:  (316) 777-2122

Account Holder Address: 951 E. 119th St. S. Peck, KS 67120

## Account Holder's Bank Information:

Name of Bank: Carson Bank

Bank Routing Number:  101103725

Bank Account Number: 133655

## Transaction Information:

Amount of Transaction: $ 931.25

Effective Date:  Upon Funding

Rate of collection: $ 931.25        per day

## Authorization:

Pursuant to that certain Future Receivables Sale and Purchase Agreement dated March 24th, 2021 between Buyer and Seller (the "Agreement"), Seller authorizes Buyer to electronically draft via the Automated Clearing House system up to the amount(s) indicated above from the account(s) identified above (the "Approved Bank Account"). The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder and acknowledges that Seller is subject to a $50 reject fee if items are returned for insufficient funds. NOTE that this authorization is to remain in full force and effect until Buyer receives written notification from Seller of its termination in such time and in such manner to afford Buyer a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement may constitute a breach of the Agreement.

FOR THE SELLER

By: _John A Brewer_
    John A Brewer (Mar 25, 2021 12:26 CDT)

Date: Mar 25, 2021

Name of Account Holder:  John A. Brewer

Title of Account Holder: OWNER/AGENT/MANAGER

## EXHIBIT B

### ADDENDUM TO
### THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY

This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated March 24th, 2021, is entered into by and among **Torro, LLC** ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

**Form of Business Entity:** Corporation                              **EIN #:** 48-1159134

("Seller #1"); and

**Business Legal Name:** _____

**D/B/A:** _____

**Form of Business Entity:** _____         **EIN #:** NA

("Seller #2").

**Name:** John A. Brewer                              ("Guarantor #1")

**Email:** elderwines@aol.com

**Phone:** (316) 777-2122

**Title:** Owner/Agent/Manager                         **SSN:** ▓▓-1476 ; and

**Name:** _____                      ("Guarantor #2")

**Email:** _____

**Phone:** _____

**Title:** Owner/Agent/Manager                         **SSN:** _____.

Hereinafter: (i) Seller #1 is referred to as the "Original Seller"; and (ii) Seller #2 is referred as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor(s) are referred to as the "Original Guarantor."

### W-I-T-N-E-S-S-E-T-H

**WHEREAS**, TLLC, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated March 24th, 2021 (the "Agreement"); and

**WHEREAS**, the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit A to the Agreement (the "Guaranty"); and

**WHEREAS**, the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

    **1.  Definitions**. All capitalized terms used herein shall have the meaning set forth in the Agreement unless otherwise indicated herein.

    **2.  Assumption of Obligations by Additional Sellers**. Each Additional Seller, jointly and severally with other Sellers, hereby assumes all of the obligations to be performed on the part of the Original Seller under or in connection with

the Agreement and agrees to keep, perform and be bound by all of the terms of the Agreement as if they were the signatories to the Agreement.

**3.   No Release from Obligations**. Neither the Original Seller nor the Original Guarantor shall be released from performance of any of their respective obligations under the Agreement and/or the Guaranty, as applicable.

**4.   Ratification of the Agreement and Guaranty, as Modified**. Notwithstanding anything to the contrary contained herein, all terms, conditions and covenants of the Agreement and the Guaranty not expressly modified by this Addendum shall remain unchanged and in full force and effect. The parties hereto hereby ratify, adopt, and approve the terms of the Agreement and the Guaranty and confirm that the Agreement and the Guaranty, as herein modified, have been since their inception and are now in full force and effect.

**5.   Binding Effect**. The covenants, conditions, provisions and agreements contained herein shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**6.   Modification**. This Addendum may not be modified orally, and no change or modification shall be binding unless the same is signed by the party against whom such change is to be enforced.

**7.   No Other Agreements**. The parties hereto agree that this Addendum represents the complete and final expression of the parties' intent and that no prior or contemporaneous oral or written agreement may be used to modify the terms herein.

**8.   Sellers' Obligations are Joint and Several.** Each Seller shall, jointly and severally with other Sellers, be responsible and liable for the representations, warranties, covenants, obligations and liabilities of the Original Seller under the Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Addendum as of the date first above written.

| For the Seller: | WYLDEWOOD CELLARS, INC. | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ✕✕✕-1476 | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ✕✕✕-1476 | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
|---|---|
| Name: | |
| Title: | |



Dear Seller,

Thank you for accepting this offer from Torro. We look forward to being your funding partner for as long as you need.

Daily ACH Program: Torro will require viewing access to your bank account, each business day, in order to calculate the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Torro will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account and be sure to indicate capital or lowercase letters. If not applicable, please write NA.

**Name of bank:** Carson Bank

**Bank portal website:** carsonbank.com

**Username:** weindok

**Password:** Arthur1477$

**Security Question/Answer 1:** Na

**Security Question/Answer 2:** Na

**Security Question/Answer 3:** NA

**Any other information necessary to access your account:**
requires a code sent to cell phone or email

na

Guarantor #1 Initials: _JAB_   Guarantor #2 Initials: _____



# BASIC CONTACT INFORMATION FOR CASH ADVANCE FUNDING CALL

_This form *must* be returned with the contract for funding call to be completed._

| BUSINESS CONTACT INFORMATION | | | |
|---|---|---|---|
| Business name | Wyldewood Cellars, Inc | Do you spend time at your business location every day? | yes |
| Business phone number | 3165549463 | If yes, what time is best to call you? | mornings |
| Business e-mail | elderwines@aol.com | Have you owned any other businesses in the past? | no |
| Business street address | 951 E 119th St | Do you own any other businesses? If so, briefly describe them. | no |
| City, state ZIP code | Peck, Ks 67120 | | |

| OWNER INFORMATION | | | |
|---|---|---|---|
| Your name | John A Brewer | | |
| Home street address | 1374 N Hydraulic Rd | | |
| City, state ZIP code | Mulvane, Ks 67110 | | |
| Cell phone number | 3162071381 | | |
| E-mail | elderwines@aol.com | | |

## EMERGENCY CONTACT – (WHO CAN WE CALL IF WE CAN'T GET IN TOUCH WITH YOU)

These references will *NOT* be contacted for funding call, or for any reason if you do not take funding from our company.

| Name | Beth Brewer | Phone | 3165549363 |
|---|---|---|---|
| Relationship to you | wife | E-mail | wineladyb@yahoo.com |

| Name | Pearl Hummel | Phone | 3165549463 |
|---|---|---|---|
| Relationship to you | aunt | E-mail | pearl@wyldewoodcellars.com |

| Name | Merry Bauman | Phone | 3165549463 |
|---|---|---|---|
| Relationship to you | sister | E-mail | merry@wyldewoodcellars.com |

## EXHIBIT C

# POWER OF ATTORNEY/COMPANY RESOLUTION AND AUTHORIZATION

We/I, the undersigned, understand and agree to all of the terms of this Power of Attorney/Company Resolution and Authorization ("Power of Attorney"), as the fully authorized and appointed officer/manager/agent, for and on behalf of the following named entity:

WYLDEWOOD CELLARS, INC. DBA WYLDEWOOD CELLARS          ( A Kansas Corporation          ) (the "Principal").

By signing below, the Principal hereby expressly designates, appoints, and authorizes Torro, LLC, a Utah limited liability company ("Torro"), its agents, managers, members, and employees, as agent/attorney in fact granting said agent/attorney in fact with full power and authority to do everything necessary in exercising any of the powers herein granted as fully as Principal might or could do if personally present, hereby ratifying and confirming all that Torro shall lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

Torro is hereby granted, and shall have and may exercise any and all of the specific powers set forth below:

1.      Banking Powers. To access, either in person or remotely by computer, tablet or other electronic device Principal's bank account(s) numbered  133655                                    held at  Carson Bank                              , as well as any other account held at the above-named bank or financial institution, for the purposes of (a) viewing all account activities including, but not being limited to  deposits, withdrawals, drafts, checks, account balances and (b) making account transfers, withdrawing funds, and (c) speaking directly with personnel of the above-named bank or financial institution about said account(s).

2.      Credit Card and Money Processors Powers. To access, either in person or remotely by computer, tablet or other electronic device, Principal's merchant accounts, such as credit card, or other processors of funds to or for Principal for the purpose of (a) viewing all credit card account(s) activity, including deposits, transfers and withdrawals and account balance(s) of credit card accounts in any way connected to or associated with the above-noted account(s), (b) making account transfers, or withdrawals to Principal of funds in the account(s), and (c) speaking directly with personnel of the above-named bank, credit card issuer or financial institution about said account(s).

3.      Revocability. This Power of Attorney is *IRREVOCABLE* for the duration of the agreement entitled Secured Merchant Agreement for the Purchase and Sale of Future Receivables (the "Agreement") between Torro and Principal. Upon successful satisfaction of the terms of the Agreement, this Power of Attorney shall automatically terminate.

4.      Third-Party Reliance. Any bank, financial institution or credit card company, including, but not being limited to the bank named in Paragraph 1 above, may rely upon the representations of Torro as to all matters relating to any power herein granted to Torro herein, including representations relating to (a) the fact that this Power of Attorney has not been revoked, and (b) the fact that Torro is and continues to serve as agent/attorney in fact. No person or entity who may act in reliance upon the representations of Torro or the authority granted to Torro hereunder shall incur any liability to the Principal or any of its owners, officers, managers, employees or other agents as a result of permitting Torro to exercise any power granted herein.

No person or entity who deals with Torro or acts upon any directions given by Torro based on this Power of Attorney shall be responsible to determine or insure the proper application of funds turned over or released to Torro pursuant to this Power of Attorney. Torro is authorized to take legal action on behalf of the Principal for any damages that may result from the bank, credit card company or other third-party's refusal to rely on or act according to the representations of Torro based on this Power of Attorney or to recognize the authority herein granted to Torro, or failure to permit Torro to exercise any power granted by this Power of Attorney.

5.      Springing Power. Although Torro is expressly and presently authorized to take any and all actions authorized hereunder, Torro agrees to take no action under this Power of Attorney so long as the Principal remains fully compliant and in good standing under the terms of the Agreement as determined in the sole and absolute discretion of Torro.

6.      Warranty. The individual(s) undersigned hereby represent and warrant that they are fully authorized to legally

execute and enter into this Power of Attorney and to bind the Principal to all of the terms hereof.
This Power of Attorney/Company Resolution and Authorization is executed and effective as of this ____ day of _____,
20___.

Principal:

WYLDEWOOD CELLARS, INC. DBA WYLDEWOOD CELLARS
Business Name

_____
Signature

John A. Brewer                    Owner/Agent/Manager
Print Name and Title

_____
Signature

_____
Print Name and Title

STATE OF _____ )
                                 :SS
COUNTY OF _____ )

On this ____ day of _____, 20___, personally appeared before me _____ (Name of Signer)
the duly authorized _____ (Title of Signer) of _____ (Principal),
who being personally known to me or whose identity was proven by credible evidence, signed the foregoing Power of
Attorney/Company Resolution and Authorization for the purposes set forth therein.

_____
NOTARY PUBLIC
My commission expires: _____

STATE OF _____ )
                                 :SS
COUNTY OF _____ )

On this ____ day of _____, 20___, personally appeared before me _____ (Name of Signer)
the duly authorized _____ (Title of Signer) of _____ (Principal),
who being personally known to me or whose identity was proven by credible evidence, signed the foregoing Power of
Attorney/Company Resolution and Authorization for the purposes set forth therein.

_____
NOTARY PUBLIC
My commission expires: _____

EXHIBIT
2

# **Clarkson & Associates, LLC**
## A T T O R N E Y S   A T   L A W

07/07/2022

### TO: Whole Foods Market

## UCC LIEN NOTICE AND NOTICE OF POWER OF ATTORNEY GRANTED BY ASSIGNOR TO TORRO, LLC GIVING TORRO, LLC POWER OF ATTORNEY OVER ACCOUNTS RECEIVABLE OF ASSIGNOR

### *RE: Wyldewood Cellars, Inc. D/B/A Wyldewood Cellars AND John A. Brewer*
### *Tax ID:  XX-XXX9134*
### *Balance due: $119,504.00*

To Whom It May Concern:

The undersigned represents Torro, LLC ("Torro") with regard to the above-captioned account. This notice is being sent pursuant to UCC 9-404 as it has come to our attention that Whole Foods Market has accounts with and has been conducting business with Wyldewood Cellars, Inc. D/B/A Wyldewood Cellars AND John A. Brewer (the "Merchant"), located at 951 E. 119th St. S. Peck, KS 67120.

Please be advised that the Merchant has defaulted on a Merchant Agreement ("Agreement") entered into by and between the Merchant and Torro on March 24th, 2021, a copy of which is enclosed herein for your reference (the "Agreement"). The balance currently due and owing to Torro pursuant to the Agreement is *$119,504.00.*

Pursuant to the Agreement, Torro purchased $75,000.00 of the Merchant's future accounts-receivable for the purchase price of $111,750.00. The Agreement was structured so that Torro was to receive a percentage of all of the Merchant's sales. In accordance with the Agreement, Torro filed a UCC-1 financing statement with the Secretary of State of Kansas thereby obtaining a perfected security interest in the Merchant's assets, including without limitation the Merchant's accounts-receivable. A Copy of the UCC-1 is also enclosed herein for your reference.

It has come to Torro's attention that Whole Foods Market has been processing payments with the Merchant without forwarding these receipts to Torro which is a violation of the UCC-1 filing and security interest and thereby interfering with the Agreement entered into by and between the Merchant and my client, Torro.

While it is understood that Whole Foods Market has an agreement with the Merchant and not Torro, this letter is nonetheless being sent to instruct to hold in reserve, all funds processed by Whole Foods Market on behalf of the Merchant, until the amount of *$119,504.00* accrues, whereupon same should be forwarded to my client, in order to mitigate the risk to both Torro and Whole Foods Market    , as the UCC-1 clearly puts all parties on notice of Torro's rights to the Merchant's assets as a secured party. I am confident that once the above-requested action is taken by Whole Foods Market, in addition to mitigating risk to Whole Foods Market with respect to converting the funds in which Torro has a secured interest, this matter will hopefully be resolved.

In addition, pursuant to the Agreement, the Merchant granted to Torro a limited power of attorney with respect to the Merchant's accounts, which can be found in paragraph 1.9 of the Agreement titled "Power of Attorney," a copy of which is both enclosed herein for reference, and which states, in relevant part:

> Merchant irrevocably appoints Torro as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Torro from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and Collect any checks, notes, drafts, instruments, documents or chattel paper in Connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Torro; and (v) to file any claims or take any action or institute any proceeding which Torro may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

Here, the Merchant is using Whole Foods Market to avoid payment to Torro pursuant to the Agreement by and between the Merchant and Torro. As holders of power of attorney with respect to the accounts receivable of the Merchant, and in accordance with the Agreement, as long as a balance is due in owing to Torro, Torro hereby demands that Whole Foods Market comply with this request to hold all funds processed on behalf of the Merchant, until the amount of *$119,504.00* accrues, whereupon same should be forwarded to Clarkson & Associates, LLC Office in trust for Torro. If need be, Torro will indemnify the Whole Foods Market for all actions taken with respect to this matter. In addition to this UCC-1 Financing Statement, we are also awaiting a signed copy of a judgment which we have filed against this merchant. Once we have received the judgment, we will forward a copy to you along with a restraining notice to further enforce Torro's right to payment.

Please comply with the above immediately, and contact me at **801-441-6009** or at Legal@torro.com if you have any questions or follow-up. I thank you in advance for your anticipated cooperation in this matter.

Sincerely,
Clarkson & Associates, LLC


Sam Patel, Esq.
Attorney

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| First Corporate Solutions - 888.507.4593 |
| B. E-MAIL CONTACT AT FILER (optional) |
| sprs@ficoso.com |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |

┌─────────────────────────────────┐
│ First Corporate Solutions       │
│ 914 S STREET                    │
│                                 │
│ SACRAMENTO CA 95811             │
│ UCC1-651644      State of Kansas, KS │
└─────────────────────────────────┘

117892620
3/25/2021

This acknowledgment reflects the information as transmitted to the State of Kansas.

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| WYLDEWOOD CELLARS, INC. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 951 E. 119th St. S. | Peck | KS | 67120 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Brewer | John | | A. | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1374 N. Hydraulic Rd.; PO Box 45 | Mulvane | KS | 67110 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| First Corporate Solutions, as representative | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 914 S Street / SPRS@FICOSO.COM | Sacramento | CA | 95811 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTUOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS,

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | | | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | | | |
| 8. OPTIONAL FILER REFERENCE DATA: | | | |
| [UCC1-651644] | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| WYLDEWOOD CELLARS, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
| --- | --- | --- |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
| --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| --- | --- | --- | --- | --- |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
| --- | --- |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)



# torro®

## Torro, LLC

5965 South 900 East Suite 300, Murray, UT 84121

### SECURED MERCHANT AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES

This agreement (this "Agreement"), dated March 24th, 2021 , between Torro, LLC ("TLLC") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

| Business Legal Name: | WYLDEWOOD CELLARS, INC. | | | | |
|---|---|---|---|---|---|
| D/B/A: | WYLDEWOOD CELLARS | | | | |
| Type of Entity: | Corporation | | | | |
| Physical Address: | 951 E. 119th St. S. Peck, KS 67120 | | | | |
| Mailing Address: | 1374 N. Hydraulic Rd. Mulvane, KS 67110 / PO Box 45 Mulvane, KS 67110 | | | | |
| EIN #: ✖✖✖ | Business Phone #: | (316) 777-2122 | Home Phone #: | | (316) 777-2122 |

| Purchase Price: | 75,000.00 | Purchased Amount: | 111,750.00 |
|---|---|---|---|
| Specified Percentage: | 12 | Daily Amount: | 931.25 |

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ✖✖✖✖ | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

**\*Accurate contact information is required to provide the Seller with important information regarding the Agreement.**
Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to TLLC by the following Owner(s)/Guarantor(s) of Seller.

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ✖✖✖✖ | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/GUARANTOR |

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto as Exhibit B (the "Addendum").

**WHEREAS,** Seller is desirous to sell to TLLC, and TLLC is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, TLLC and Seller hereby agree to the foregoing and as follows:

**1. Basic Terms and Definitions.**

Guarantor #1 Initials: _JAB_                    Guarantor #2 Initials: _____

a. "**Effective Date**" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when TLLC paid the Purchase Price to Seller.

b. "**Specified Percentage**" shall mean 12 _____ (12 %) of each and every sum from sale made by Seller of Future Receipts.

c. "**Future Receipts**" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

d. "**Daily Receipts**" shall mean the amount of Future Receipts received by Seller on a daily basis.

e. "**Purchased Amount**" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to TLLC pursuant to this Agreement. The parties agree that the Purchased Amount shall be $111,750.00 .

f. "**Purchase Price**" shall mean the total amount that TLLC agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from TLLC pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i., j. and k. below. The parties agree that the Purchase Price shall be $ 75,000.00 .

g. "**Initial Daily Installment**" shall mean the fixed amount that Seller and TLLC agree to be a good faith approximation of the Specified Percentage of Seller's Daily Future Receipts. Seller and TLLC further agree that, based upon the information provided by Seller to TLLC concerning Seller's most recent accounts receivables, including representations by the Seller to TLLC regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement, as of the Effective Date the Initial Daily Installment shall be $ 931.25 .

h. "**Workday**" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

i. "**Applicable Fees**" shall mean, collectively, all initial costs and fees that Seller agrees to pay to TLLC as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

j. "**Prior Balance**" shall mean the sum of all amounts that Seller may owe to TLLC and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

k. "**Origination Fee**" shall mean the fee that Seller and a Broker have agreed to in conjunction with brokering this Agreement, which amount Seller authorizes TLLC to withhold from the Purchase Price and pay to said Broker. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

l. In the event "**Seller**" is comprised of more than one entity, then:

    i. The term "Seller" shall mean, individually and collectively, all such entities; and

    ii. Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

    iii. The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

    iv. The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

    v. The terms "Specified Percentage", "Future Receipts", "Daily Receipts", "Initial Daily Installment" shall mean the Specified Percentage, the Future Receipts and the Daily Receipts of each Seller individually; and

    vi. TLLC may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

m. In the event "**Guarantor**" is comprised of more than one individual, then:

    i. The term "Guarantor" shall mean, individually and collectively, all such individuals; and

    ii. Each Guarantor is an Affiliate of all other Guarantor(s); and

    iii. The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several

Guarantor #1 Initials: _JAB_    Guarantor #2 Initials: _____

under this Agreement and the Guaranty; and

   iv. The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

   v. TLLC may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2. The Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to TLLC pursuant to this Agreement are received by TLLC in full.

**3. Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers, and conveys (hereinafter, the "Sale") unto TLLC all of Seller's right, title, and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to TLLC (hereinafter, the portion of the Future Receipts sold by Seller to TLLC pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto TLLC, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to TLLC of collectability of the Purchased Future Receipts by TLLC and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to TLLC full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4. Payment of Purchase Price.** In consideration of the sale by Seller to TLLC of the Purchased Future Receipts pursuant to this Agreement, TLLC agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5. Use of Purchase Price.** Seller hereby acknowledges that it fully understands that: (i) TLLC's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to TLLC in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business TLLC's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6. Initial Daily Installments of Purchased Amount.** The Purchased Amount shall be delivered by Seller to TLLC daily in the amount of the Initial Daily Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

**7. Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by TLLC (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by TLLC (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be. Seller acknowledges and agrees that any change in the Approved Bank Account or Credit Card Processor is subject to a $50 bank change as TLLC is required to make the necessary system and account adjustments.

**8. Authorization to Debit Approved Bank Account.** Seller hereby authorizes TLLC to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed on Appendix A hereto) in the amount of the Initial Daily Installment on each Workday commencing on the Effective Date until TLLC receives the full Purchased Amount. Seller shall provide TLLC with all access code(s) for the Approved Bank Account. Seller acknowledges and understands that a $39 ACH restricted account fee will be added for each day that TLLC is unable to access the Approved Bank Account via the credentials Seller has provided.

**9. Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or TLLC's banking institution directly (or to compensate TLLC, in case it is charged) all fees, charges and expenses incurred by either Seller or TLLC due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $50.00 charge per bounced or rejected ACH debit.

**10. Seller's Right for Reconciliation.** Seller and TLLC each acknowledge and agrees that:

   **a.** If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Daily Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by TLLC (each such calendar month, a "Reconciliation Month").

   **b.** Such reconciliation (the "Reconciliation") of the Seller's Initial Daily Installment for a Reconciliation Month shall be performed by TLLC within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by TLLC from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

   **c.** One or more Reconciliation procedures performed by TLLC may reduce or increase the effective Initial Daily Installment

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials:_____

amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which TLLC will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11. Request for Reconciliation Procedure.**

    **a.** It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Daily Installments during any Reconciliation Month by sending a request for Reconciliation to TLLC.

    **b.** Any such request for Reconciliation of the Seller's Initial Daily Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement and credit card processing statements for the Reconciliation Month at issue, and shall be received by TLLC via email to billing@torro.com, with the subject line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by TLLC).

    **c.** TLLC's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

    **d.** Commencing thirty (30) days after the Effective Date of this Agreement, Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and TLLC shall comply with each such request, provided that:

        **i.** Each such request is made in accordance with the terms of this Section 11; and

        **ii.** If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by TLLC from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

    **e.** Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with TLLC's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by TLLC in full, or (ii) modify the amount of the Initial Daily Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

**12. Adjustment of the Initial Daily Installment.** Seller and TLLC each acknowledge and agree that:

    **a.** If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Daily Installment that Seller is obligated to deliver daily to TLLC in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Daily Installment (the "Adjusted Daily Installment") shall replace and supersede the amount of the Initial Daily Installment set forth in Section 1 above.

    **b.** The Adjustment of the Initial Daily Installment shall be performed by TLLC within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Daily Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

    **c.** One or more Adjustments performed by TLLC may substantially extend the term of this Agreement.

**13. Request for Adjustment Procedure.**

    **a.** It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to TLLC.

    **b.** A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of TLLC's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to TLLC based upon which statements the amount of the Initial Daily Installment set forth in Section 1 above (or the then current Adjusted Daily Installment, as the case may be) was determined, and shall be received by TLLC by email at billing@torro.com, with the subject line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by TLLC).

    **c.** TLLC's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

    **d.** Seller shall have the right to request Adjustment of the Initial Daily Installment, or the Adjusted Daily Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and TLLC shall comply in good faith with such request, provided that:

        **i.** Each such request for Adjustment is made in accordance with the terms of this Section 13; and

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials: _____

**ii.** A request for Adjustment shall not be made after the Expiration Date.

**e.** Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with TLLC's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by TLLC in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

## 14. Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

**a.** Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from TLLC of the Purchase Price, and upon obtaining TLLC's prior written consent, to accelerate delivery to TLLC of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

**b.** The Outstanding PAFR can only be delivered in full and not partially.

**c.** Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying TLLC to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

**d.** TLLC shall respond to Seller's request within three (3) Workdays from the date of its receipt by TLLC.

**e.** In its response to Seller's request, TLLC shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

**f.** As of the date agreed upon as between TLLC and Seller, Seller shall deliver to TLLC the full amount of the Outstanding PAFR (such date, the "Accelerated Delivery Date").

**g.** Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to TLLC of the Initial Daily Installments prior to the delivery of the Outstanding PAFR to TLLC.

**h.** Upon delivery of the Outstanding PAFR to TLLC in compliance with the provisions of this Section 14, Seller's obligations to TLLC pursuant to this Agreement shall be deemed completed and fulfilled.

## 15. Rights and Obligations of TLLC Upon Receipt of the Outstanding PAFR. Upon receipt of the full amount of the Outstanding PAFR:

**a.** TLLC shall notify the Approved Bank Account and request from it to stop transferring Initial Daily Installments to TLLC's bank account.

**b.** If TLLC shall have received one or more Initial Daily Installment (or Adjusted Daily Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing TLLC's request described in subparagraph (a) above or for any other reason), TLLC shall immediately do one of the two following things (but not both):

**i.** Return to Seller the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the date of delivery of the Outstanding PAFR to TLLC; or

**ii.** Apply the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date toward Seller's outstanding financial obligations to TLLC existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

**A.** By way of example, if as of the Accelerated Delivery Date, Seller and TLLC would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event TLLC may, in its sole and absolute discretion, apply the sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to TLLC pursuant to the Unrelated Future Agreement.

**c.** Seller acknowledges and agrees that TLLC shall have the right to apply the total sum of the Initial Daily Installments (or Adjusted Daily Installments, as the case may be) received by TLLC after the Accelerated Delivery Date toward Seller's outstanding financial obligations to TLLC existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, TLLC granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

## 16. Risk Sharing Acknowledgments and Arrangements.

**a.** Seller and TLLC each hereby acknowledges and agrees that:

**i.** The Purchased Future Receipts represent a portion of Seller's Future Receipts.

**ii.** This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from TLLC. TLLC does not charge Seller and will not collect from Seller any interest on the monies used by TLLC for the purchase of the Purchased Future Receipts. The period of time that it will take TLLC to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after TLLC's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, TLLC may never collect all

Guarantor #1 Initials: _____ Guarantor #2 Initials: _____

or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

    **iii.** The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to TLLC.

    **iv.** The amounts of Seller's future Daily Receipts may increase or decrease over time.

    **v.** If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual daily amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Daily Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and TLLC may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

    **b. TLLC's Risk Acknowledgments.** TLLC agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and TLLC assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give TLLC a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, TLLC hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):

    **i.** adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

    **ii.** loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

    **iii.** bankruptcy of Seller; and/or

    **iv.** natural disasters or similar occurrences beyond Seller's control.

    **c. Application of Amounts Received by TLLC.** TLLC reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to TLLC from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

    **d. Not a Loan.** Seller and TLLC agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by TLLC is not intended to be, nor shall it be construed as, a loan from TLLC to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, TLLC's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to TLLC in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that TLLC has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by TLLC shall automatically be reduced to the maximum rate permitted by applicable law and TLLC shall promptly refund to Seller any interest received by TLLC in excess of the maximum lawful rate.

**17. Applicable Fees.** Seller acknowledges that the Applicable Fees were agreed upon between Seller and TLLC prior to Seller entering into this Agreement, were subject to arm-length negotiation between TLLC and Seller, and a detailed list of the Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18. Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless TLLC for any and all damages and losses (including without limitation legal fees and expenses) incurred by TLLC as the result of such representation being untrue, incorrect or incomplete.

**19. Origination Fee.** To the extent that Seller has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Seller hereby requests and agrees for TLLC to withhold from the Purchase Price, and pay to the third-party broker associated with this Agreement, the Origination Fee contained in Rider 3, which is attached hereto and made a part hereof.

**20. No Reduction of Purchase Price.** Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.** Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

Guarantor #1 Initials: _JAB_        Guarantor #2 Initials: _____

**a. Financial Condition and Financial Information**. Seller's bank and financial statements, copies of which have been furnished to TLLC, and future statements which may be furnished hereafter pursuant to this Agreement or upon TLLC's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise TLLC of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. TLLC may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to TLLC within five (5) Workdays. Seller's failure to do so, and/or cutting off TLLC's online access to the Approved Bank Account, is a material breach of this Agreement.

**b. Governmental Approvals**. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**c. Good Standing**. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization, and has full power and authority necessary to carry its business as it is now being conducted.

**d. Authorization**. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

**e. Accounting Records and Tax Returns**. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that TLLC is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f. Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

**g. Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming TLLC as loss payee and additional insured in the amounts and against risks as are satisfactory to TLLC and shall provide TLLC proof of such insurance upon request.

**h. Electronic Check Processing Agreement**. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede TLLC's rights under this Agreement, without TLLC's prior written consent.

**i. No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without TLLC's written permission.

**j. Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and TLLC, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining TLLC's written consent.

**k. Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining TLLC's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l. No Closing of Business**. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of TLLC, and (ii) providing TLLC with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to TLLC. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until TLLC shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide TLLC ten (10) business days advance notice.

**m. No Pending Bankruptcy**. As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n. Estoppel Certificate**. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from TLLC to Seller, execute, acknowledge and deliver to TLLC and/or to any other person or entity specified by TLLC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as

Guarantor #1 Initials: _JAB_   Guarantor #2 Initials: _____

modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o. Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p. No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of TLLC.

**q. Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r. No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s. Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants TLLC the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants TLLC and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide TLLC, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow TLLC to interview any of those parties.

**t. Phone Recordings and Contact.** Seller agrees that any call between Seller and TLLC and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with TLLC, its managers, employees and agents (collectively, the "TLLC Parties") and that Seller may be contacted by any of the TLLC Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the TLLC Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**u. Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**v. Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by TLLC.

**w. Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**x. TLLC's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining TLLC's consent, such consent may be withheld, granted or conditioned at TLLC's sole and absolute discretion.

**y. No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and TLLC with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by TLLC or any of the TLLC Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the TLLC Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

**z. No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, set forth in Sections 17-19 herein, TLLC is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Sections 17-19 hereof, such fee is not charged by TLLC. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

## PLEDGE OF SECURITY

**22. Pledge.** As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to TLLC (collectively, "Pledge") and grants to TLLC a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

**a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform

Guarantor #1 Initials: _JAB_          Guarantor #2 Initials:_____

Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.** All Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23. Termination of Pledge.** Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, TLLC will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24. Representations with Respect to Collateral.** Seller hereby represents and warrants to TLLC that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25. Further Assurances.** Upon the request of TLLC, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as TLLC may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26. Attorney-in-Fact.** Seller hereby authorizes TLLC at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints TLLC as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in TLLC's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse, and collect all instruments made payable to Seller.

## EVENTS OF DEFAULT AND REMEDIES

**27. Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    **a.** Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) to TLLC, and timely and in full payment to TLLC of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    **b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with TLLC (if any) which is related to the instant Agreement.

    **d.** Seller uses multiple depository accounts without obtaining prior written consent of TLLC in each instance.

    **e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of TLLC in each instance.

    **g.** Seller interferes with TLLC collection of Initial Daily Installments (or Adjusted Daily Installments, as the case maybe).

    **h.** Four (4) or more ACH transactions attempted by TLLC are rejected by Seller's bank.

    **i.** The Guaranty shall for any reason cease to be in full force and effect.

**28. Default under the Agreement.** In case any Event of Default occurs and is not waived by TLLC, in writing, TLLC may declare Seller in default under this Agreement without notice.

**29. Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to TLLC the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to TLLC, as additional damages, any reasonable expenses incurred by TLLC in connection with recovering the monies due to TLLC from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that TLLC shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as twenty-five percent (25%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or twenty-five hundred dollars ($2,500.00), whichever is greater. The entire sum due to TLLC pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 16.00% per annum (and such interest shall accrue daily). If Seller blocks Torro's ACH debit of the Approved Bank Account or Credit Card Processor, bounces more than 4 debits of the Approved Bank Account or Credit Card Processor, or simultaneously uses multiple bank accounts or credit card processors to process its receipts, than Seller is subject to an Unauthorized Account Fee of five thousand dollars ($5,000.00). Seller is subject to a $249.00 risk assessment fee in the Event of Default for TLLC's underwriting and assessing the method of collection to be used herein.

**30. Remedies Upon Default.** Upon Seller's default, TLLC may immediately proceed to protect and enforce its rights under this

Guarantor #1 Initials: _JAB_      Guarantor #2 Initials:_____

Agreement and/or Guaranty by:

    **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of TLLC's security interest;

    **b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

    **c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to TLLC of all or any portion of the amounts received by such credit card processor on behalf of Seller.

    **d.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation TLLC's rights of a secured party under the UCC.

**31. Remedies are not Exclusive.** All rights, powers and remedies of TLLC in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to TLLC by law or equity.

**32. Power of Attorney.** Seller irrevocably appoints TLLC and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to TLLC from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code ("Account Debtors"), to make payment directly to TLLC (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which TLLC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount. Please see "Exhibit C" for all powers and authorities given to TLLC. TLLC will only execute "Exhibit C" upon occurrence of an Event of Default, otherwise it will not be applied or executed by any means.

**ADDITIONAL TERMS**

**33. Seller Deposit Agreement.** Seller shall execute an agreement with TLLC that shall authorize TLLC to arrange for electronic fund transfer services and/or "ACH" payments of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) from the Approved Bank Account. Seller shall provide TLLC and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) TLLC and/or it's agent to deduct daily the amounts of the Initial Daily Installment (or the Adjusted Daily Installment, as the case may be) to TLLC from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to TLLC by permitting TLLC to withdraw the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34. Financial Condition.** Seller and its Guarantor(s) authorize TLLC and its agents to investigate their financial status and history, and will provide to TLLC any bank or financial statements, tax returns, etc., as TLLC deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. TLLC Seller hereby authorizes TLLC to receive from time to time updates on such information and financial status.

**35. Transactional History.** Seller shall execute written authorization(s) to their bank(s) to provide TLLC with Seller's banking and/or credit-card processing history. Upon request from Buyer, at any time that an obligation between buyer and seller exist, Buyer reserves the right to request that Seller provide Seller's Banking and/or credit-card processing history, as required by the extents herein.

**36. Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by TLLC for monies owed to TLLC from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by TLLC.

**37. No Liability.** In no event shall TLLC be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

**MISCELLANEOUS**

**38. Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39. Assignment.** TLLC may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining TLLC's written consent.

**40. Notices.** Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties

Guarantor #1 Initials: _JAB_      Guarantor #2 Initials: _____

to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

**41. Waiver Remedies.** No failure on the part of TLLC to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43. Governing Law, Venue, and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Utah, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in Utah State, (the "**Acceptable Forums**"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in Utah, that the Specified Percentage of the Future Receipts are being delivered to TLLC in Utah, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in Utah. Seller and its Guarantor(s) acknowledge and agree that Utah has a reasonable relationship to this transaction.

**44. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45. Severability.** In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46. Entire Agreement.** This Agreement embodies the entire agreement between Seller and TLLC and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

**47. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**49. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH TLLC, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND TLLC SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**50. SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE UTAH STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON SELLER'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE**

Guarantor #1 Initials: _JAB_        Guarantor #2 Initials:_____

12

AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN SELLER'S ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**51. Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer* <br> John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | XXXXX | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR**

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer* <br> John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | XXXXX | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
|---|---|
| Name: | |
| Title: | |

Guarantor #1 Initials: _JAB_   Guarantor #2 Initials: _____

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>March 24th, 2021</u>, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **Torro, LLC** ("Buyer").

**WHEREAS:**

A. Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of <u>March 24th, 2021</u>, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

**THE SELLER:**

**Legal Business Name:** <u>WYLDEWOOD CELLARS, INC.</u> and the entities listed on "Exhibit B"

**D/B/A:** <u>WYLDEWOOD CELLARS</u>

B. Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

C. Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    **a.** any amendment, modification or extension of the Agreement or any Obligation;

    **b.** any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    **c.** any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    **d.** any other guaranty now or hereafter executed by Guarantor or anyone else;

    **e.** any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    **f.** any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    **g.** the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    **h.** the failure to give Guarantor any notice whatsoever;

    **i.** any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents

Guarantor #1 Initials: <u>_JAB_</u>       Guarantor #2 Initials:_____

that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty. Guarantor additionally consents to the ordering of a credit report for Guarantor (a) as a condition precedent to Buyer entering into this Agreement, (b) from time to time during the entire Term of the Agreement, and (c) in the event of default pursuant to the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of Utah without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in Utah State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in Utah, that the Specified Percentage of the Future Receipts are being delivered to Buyer in Utah, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in Utah. Guarantor acknowledges and agrees that it is guaranteeing a Utah agreement and transaction. Guarantor acknowledges and agrees that Utah has a reasonable relationship to this transaction.

**8. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**9. CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**10. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

Guarantor #1 Initials: _JAB_     Guarantor #2 Initials: _____

**11.** <u>SERVICE OF PROCESS.</u> IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE UTAH STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON HIM/HER/THEM BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON GUARANTOR'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR SHALL PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN GUARANTOR'S ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**12. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**14. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

| For Owner/Guarantor #1 (print full name): | John A. Brewer | Signature: | *John A Brewer* John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | XXXXXX | Title: | OWNER/AGENT/MANAGER |

| For Owner/Guarantor #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
|---|---|
| Name: | |
| Title: | |

Guarantor #1 Initials: _JAB_   Guarantor #2 Initials: _____

## RIDER 1

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated March 24th, 2021

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the March 24th, 2021 Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to TLLC, pursuant to Section 17 of the Agreement shall be as follows:

  a. **Due Diligence Fee:** Four to ten percent (10%) of the Purchase Price (the cost of the due diligence of Seller' business performed by TLLC. As a general rule, the Due Diligence Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc.).

  b. **ACH Program Fee:** $395.00 (to cover expense of ACH processing program).

  c. **UCC Fee:** $195.00 (part of filing UCC financing statements and their terminations).

  d. **Wire Fee:** $35.00 (to cover cost of remitting the Purchase Price).

**4. Authorization.** Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to Section 17 of the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer* John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | XXXXX | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

Guarantor #1 Initials: _JAB_    Guarantor #2 Initials: _____

## RIDER 2

### TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated March 24th, 2021

### PRIOR BALANCE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Prior Balance**. Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE: $** 0.00

**4. Authorization**. Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to TLLC and/or the creditors listed in this Rider.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

**6. Indemnification.** Seller hereby indemnifies and holds harmless TLLC for any and all damages and losses (including without limitation legal fees and expenses) incurred by TLLC as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
|---|---|---|---|
| SSN: | ✕✕✕✕✕ | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
|---|---|---|---|
| SSN: | | Title: | OWNER/AGENT/MANAGER |

Guarantor #1 Initials: *JAB*        Guarantor #2 Initials: _____

## RIDER 3

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between Torro, LLC ("TLLC") and

**Business Legal Name:** WYLDEWOOD CELLARS, INC.

**D/B/A:** WYLDEWOOD CELLARS

and the entities listed on "Exhibit B" **("Seller")**, dated  March 24th, 2021

### ORIGINATION FEE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**. The parties agree that the Origination Fee that Seller shall pay to TLLC pursuant to Section 19 of the Agreement shall be:
$ 0.00

**4. Authorization**. Seller hereby authorizes TLLC to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and TLLC agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

| For Seller #1 (print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer [Mar 25, 2021 11:26 CDT] |
| --- | --- | --- | --- |
| SSN: | ⬡⬡⬡⬡⬡ | Title: | OWNER/AGENT/MANAGER |

| For Seller #2 (print full name): | | Signature: | |
| --- | --- | --- | --- |
| SSN: | | Title: | OWNER/AGENT/MANAGER |

the Agreement and agrees to keep, perform and be bound by all of the terms of the Agreement as if they were the signatories to the Agreement.

**3. No Release from Obligations.** Neither the Original Seller nor the Original Guarantor shall be released from performance of any of their respective obligations under the Agreement and/or the Guaranty, as applicable.

**4. Ratification of the Agreement and Guaranty, as Modified.** Notwithstanding anything to the contrary contained herein, all terms, conditions and covenants of the Agreement and the Guaranty not expressly modified by this Addendum shall remain unchanged and in full force and effect. The parties hereto hereby ratify, adopt, and approve the terms of the Agreement and the Guaranty and confirm that the Agreement and the Guaranty, as herein modified, have been since their inception and are now in full force and effect.

**5. Binding Effect.** The covenants, conditions, provisions and agreements contained herein shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**6. Modification.** This Addendum may not be modified orally, and no change or modification shall be binding unless the same is signed by the party against whom such change is to be enforced.

**7. No Other Agreements.** The parties hereto agree that this Addendum represents the complete and final expression of the parties' intent and that no prior or contemporaneous oral or written agreement may be used to modify the terms herein.

**8. Sellers' Obligations are Joint and Several.** Each Seller shall, jointly and severally with other Sellers, be responsible and liable for the representations, warranties, covenants, obligations and liabilities of the Original Seller under the Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Addendum as of the date first above written.

| For the Seller: | WYLDEWOOD CELLARS, INC. | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
| --- | --- | --- | --- |
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For<br>Owner/Guarantor #1<br>(print full name): | John A. Brewer | Signature: | *John A Brewer*<br>John A Brewer (Mar 25, 2021 11:26 CDT) |
| --- | --- | --- | --- |
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For<br>Owner/Guarantor #2<br>(print full name): | | Signature: | |
| --- | --- | --- | --- |
| SSN: | | Title: | OWNER/AGENT/MANAGER |

| For Torro, LLC: | |
| --- | --- |
| Name: | |
| Title: | |



Dear Seller,

Thank you for accepting this offer from Torro. We look forward to being your funding partner for as long as you need.

Daily ACH Program: Torro will require viewing access to your bank account, each business day, in order to calculate the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Torro will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account and be sure to indicate capital or lowercase letters. If not applicable, please write NA.

**Name of bank:**

na

Guarantor #1 Initials: _JAB_  Guarantor #2 Initials: _____

To:
491
Suite 201
St. George, UT 84770

PITNEY BOWES
$1.56 0
US POSTAGE
FIRST-CLASS
026W0004897486
2000204767
ZIP 84770
JUL 07 2022

Whole foods market
an Amazon company
C/O Corporation Service Co.
300 Descutes Way
Suite 208 MC-CSC1
Turnwater, WA 98501
ATTN: Legal Dept. -Legal Process

The Order of the Court is stated below:
**Dated:** July 07, 2021          /s/   JEFFREY C WILCOX
                10:55:41 AM                District Court Judge

Matthew D. Spring – 14336
Satesh Sam Patel – 16714
CLARKSON & ASSOCIATES, LLC
162 North 400 East, Suite A-204
St. George, Utah 84770
Telephone: (435) 634-1940
mspring@clarksonlegal.com
spatel@clarksonlegal.com
*Attorneys for Plaintiff*

**EXHIBIT**

**3**

## IN THE FIFTH JUDICIAL DISTRICT COURT
## IN AND FOR WASHINGTON COUNTY, STATE OF UTAH

| | |
|---|---|
| TORRO, LLC; a Utah Limited Liability Company;<br><br>Plaintiff,<br><br>v.<br><br>WYLDEWOOD CELLARS, INC., a Kansas Corporation, and JOHN A. BREWER, an individual;<br><br>Defendant | **DEFAULT JUDGMENT**<br><br>Case No.   210500340<br><br>Judge:     Jeffrey C. Wilcox |

Defendant Wyldewood Cellars, Inc., a Kansas Corporation and Defendant John A. Brewer, an individual (collectively referred to as "Defendants"), have each failed to plead or otherwise defend in this action against Plaintiff's Complaint, and default having been entered, this Court hereby enters judgment as follows:

**IT IS HEREBY ORDERED AND DECREED** that Torro, LLC, a Utah limited liability company ("Plaintiff"), have and recover judgment against said Defendants, jointly and severally, in favor of Plaintiff for breach of contract, in an amount of $118,669.00, plus cost of suit in the amount of $375.00, plus $110.00 for service of process, plus reasonable attorneys' fee in the

amount of $350.00, pursuant to Rule 73 of the Utah Rules of Civil Procedure, plus pre- and post-judgment interest at the rate 16% per annum from the date of default through the date when the principal amount is paid in full, for a total judgment amount of $119,504.00.

**\*\* END OF ORDER \*\* — Court signature at top of first page**